In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-1413

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ELDRED C. CLAYBROOKS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:08-cr-1028-12 — **Joan B. Gottschall**, *Judge.*

ARGUED APRIL 10, 2013 — DECIDED SEPTEMBER 5, 2013

Before POSNER, WOOD, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* While investigating a large drug distribution conspiracy involving Robert Atkins, federal agents also uncovered a smaller operation involving Atkins and his friend, Eldred Claybrooks. Claybrooks was eventually charged with two drug-related offenses arising from his relationship with Atkins including one count of conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1). Following a trial in which Atkins served as the

government's key witness, Claybrooks was convicted and sentenced to 20 years' imprisonment.

On appeal, Claybrooks argues that the government failed to present enough evidence for a reasonable jury to find him guilty of conspiracy beyond a reasonable doubt. We do not view the evidence the same way. Both Atkins's testimony and recordings of conversations between Atkins and Claybrooks supplied enough evidence for a reasonable jury to find that the two men knowingly agreed to distribute cocaine. Claybrooks also challenges his sentence on the basis that the district court did not make a determination regarding the amount of drugs involved in the conspiracy. On this issue, we agree. After reviewing the sentencing transcript, we conclude that the district court did not make a finding concerning the amount of drugs involved in Claybrooks's offense. Therefore, we affirm Claybrooks's conviction but vacate his sentence and remand for resentencing.

## I. BACKGROUND

In 2006, FBI agents began looking into various drug distribution networks in northeastern Illinois. Investigators soon focused their attention on Robert Atkins, a large-scale cocaine distributor in the area. To get a sense of Atkins's operations, FBI agents obtained court orders for wiretaps on two of his phones and began recording his telephone conversations.

Over the course of their investigation, FBI agents intercepted several calls between Atkins and Eldred Claybrooks. In the recorded conversations, Atkins and Claybrooks discussed the details of various cocaine transactions. In one May 2007 phone call, Claybrooks brokered the sale of two

kilograms of cocaine between Atkins and Claybrooks's cousin.

The two men also discussed customer relations problems that Claybrooks encountered when distributing cocaine he received from Atkins. During one series of calls in June 2007, Claybrooks complained to Atkins about the quality of some cocaine that he had recently purchased. Claybrooks told Atkins that he wanted to return the cocaine in exchange for a refund or another kilogram of better quality. When Atkins asked whether the kilogram was largely intact (and therefore suitable for return to Atkins's supplier), Claybrooks said no. Claybrooks stated that his customers had removed nine ounces from the kilogram to test its strength, and, disappointed with the results, had returned the remainder to Claybrooks. This was a problem for Atkins. With so much of the original kilogram now missing, Atkins's supplier would not exchange it for another kilogram. Atkins then reminded Claybrooks about the proper way to have his customers test a kilogram of cocaine, which was to remove an ounce or two from the corner while keeping the packaging intact:

> I told you a million times … we went over this s--t … as long as it's wrapped up, cut that corner[,] get you a zip out or two, do what'ch you gotta do. If it ain't right, stick that s--t back in that corner. Put some tape on that corner and bring that s--t back.

A grand jury eventually indicted Claybrooks on two drug-related felonies as a result of his dealings with Atkins. Claybrooks was charged with one count of conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 846 and

841(a)(1) and one count of distribution of 500 grams or more of cocaine in violation of 21 U.S.C. § 841(a)(1).

At trial, the government relied heavily on testimony from Atkins to establish Claybrooks's guilt. Atkins testified that he began supplying Claybrooks with cocaine in 2001. According to Atkins, over the next seven years he regularly distributed cocaine to Claybrooks in quantities ranging from four and a half ounces to several kilograms. Atkins typically provided the drugs to Claybrooks on consignment. Under this arrangement, Claybrooks would receive the cocaine from Atkins, resell it, and then pay Atkins using the proceeds. If, for some reason, Claybrooks could not resell the cocaine, he could return it to Atkins. In total, Atkins estimated that he distributed between twenty and thirty kilograms of cocaine to Claybrooks over the course of their relationship. Nor was their relationship entirely one-sided: Atkins also stated that Claybrooks supplied him with kilograms of cocaine on three or four occasions.

Atkins also testified that Claybrooks occasionally brokered cocaine sales between Atkins and Claybrooks's customers. On occasion, Atkins told jurors, Claybrooks would identify a customer that wanted to purchase cocaine from Atkins. Claybrooks would collect the purchase money from his customer on Atkins's behalf and then deliver the money to Atkins. Once Atkins had the money, he would then give Claybrooks a kilogram of cocaine for delivery to his customer. In one such transaction, Claybrooks told Atkins about a customer in Bloomingdale, Illinois, who wanted to buy three to four kilograms of cocaine. Atkins supplied Claybrooks with the requested amount of cocaine and had him deliver it to the customer.

Atkins stated that his association with Claybrooks ended in August 2008. Around that time, Atkins testified, he provided Claybrooks with $60,000 to purchase two kilograms of cocaine on Atkins's behalf. According to Atkins, Claybrooks took the money but never delivered the cocaine. Atkins tried to resolve the situation but Claybrooks kept avoiding him and would not return his phone calls.

Atkins also testified about certain recorded telephone conversations he had with Claybrooks. After a portion of the conversation was played for the jury, Atkins would testify regarding the meaning of the coded language used and provide context about the matters discussed. In this way, Atkins described a May 2007 conversation in which Claybrooks brokered a cocaine deal between Claybrooks's cousin and Atkins. Atkins also informed the jury of the details surrounding some calls in June 2007 regarding Claybrooks's customer relations issues.

At the conclusion of the trial, the jury found Claybrooks guilty of both the conspiracy charge and the distribution charge. In addition to the general guilt determination, the jury also made special findings regarding the amount of drugs involved in each offense. On the verdict form, the jury was asked to select which of three possible quantity ranges correctly characterized the amount of cocaine involved in each offense: (1) a measurable amount but less than 500 grams; (2) at least 500 grams, but fewer than five kilograms; or (3) five kilograms or more. The jury found that both counts involved at least 500 grams but fewer than five kilograms of mixtures containing cocaine.

The United States Probation Office prepared a Presentence Investigation Report ("PSR") on Claybrooks following

his conviction. In the PSR, the Probation Office concluded that Claybrooks should be held responsible for at least seven kilograms of cocaine. The Probation Office based its drug quantity finding on the following evidence: (1) Atkins's testimony and wiretap recordings suggesting that Atkins provided Claybrooks with one kilogram of cocaine in June 2007; (2) Atkins's testimony that Claybrooks supplied him with a kilogram of cocaine on three occasions; and (3) Atkins's testimony that he provided Claybrooks with three kilograms of cocaine for delivery to a customer in Bloomingdale. On this last point, the PSR contained a notation that the transaction was corroborated by proffer statements from Claybrooks's co-defendant, Robert Wasp, in which Wasp stated that he delivered three kilograms of cocaine to Claybrooks on Atkins's behalf. Based on its drug quantity finding and Claybrooks's prior felony drug conviction, the Probation Office concluded that he was subject to a mandatory minimum sentence of 20 years. *See* 21 U.S.C. § 841(b)(1)(A).

Claybrooks's sentencing hearing took place on February 14, 2012. At the hearing, the government argued that Claybrooks was responsible for at least 20 kilograms of cocaine based on Atkins's testimony that he supplied between 20 and 30 kilograms to Claybrooks over the course of their relationship. In response, Claybrooks contended that Atkins's estimate was too unreliable. Instead, Claybrooks asked the court to adopt the jury's finding as to the quantity of cocaine involved in his offenses, between 500 grams and 5 kilograms, an amount that would set Claybrooks's mandatory minimum sentence at 10 years. *See* 21 U.S.C. § 841(b)(1)(B).

In the end, the district court declined to adopt the drug quantities advanced by either Claybrooks or the govern-

ment. The court noted that Atkins's 20–30 kilogram approximation of the amount of drugs he dealt to Claybrooks was "too indefinite for me to even find that it satisfies preponderance." The court was uncomfortable with accepting Atkins's estimate of the total amount of drugs involved in light of certain ambiguities in his testimony:

> So we've got [Atkins] talking about a relationship that started with dealing 4.5-ounce quantities and over time became a relationship where there were kilos transferred, but he never told us how many kilos a year were transferred. He just said the relationship actually grew to that. So I think that—and then, you know, we've got three or four times he says that he thinks the defendant provided him with a kilo.

Given its concerns with Atkins's testimony on this issue, the court concluded that "we're pretty secure based on the testimony in going with the PSR, which is 5 to 15 kilograms." The court characterized this amount as a "compromise between Atkins'[s] estimate, which he didn't pin down at all, and the jury's finding, which was minimal."

On this reasoning, the district court determined that Claybrooks's mandatory minimum sentence was 20 years. After acknowledging that "the mandatory minimums as they operate in this case make no sense," the district court sentenced Claybrooks to the mandatory minimum term of incarceration. Claybrooks now appeals both his conviction and his sentence.

## II. ANALYSIS

Claybrooks presents two challenges on appeal. He first argues that the government did not present sufficient evi-

dence at trial to prove he was guilty of conspiring with Atkins to distribute cocaine. He next contends that the district court erred in failing to make a finding as to the amount of cocaine implicated in his offense conduct.

### A. Government Presented Enough Evidence to Support Conspiracy Conviction

Claybrooks asks that we vacate his conspiracy conviction because the evidence in the trial record was insufficient for a reasonable jury to find that he entered into an agreement with Atkins to distribute cocaine. Because Claybrooks preserved this argument by moving for a judgment of acquittal at the close of the prosecution's case, we review his claim de novo. *United States v. Tavarez*, 626 F.3d 902, 906 (7th Cir. 2010). When evaluating a challenge to the sufficiency of the evidence, "we consider the evidence in the light most favorable to the prosecution, making all reasonable inferences in its favor, and affirm the conviction so long as any rational trier of fact could have found the defendant to have committed the essential elements of the crime." *United States v. Vallar*, 635 F.3d 271, 286 (7th Cir. 2011) (internal quotation marks omitted).

According to Claybrooks, the government's evidence only established a series of transactions between him and Atkins and could not support a finding that the two men were part of a larger conspiracy to distribute drugs. To convict a defendant of conspiracy the government must establish that (1) two or more people agreed to commit an unlawful act; and (2) the defendant knowingly and intentionally joined in the agreement. *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008). For a drug-distribution conspiracy, the government must prove "that the defendant knowingly agreed—

either implicitly or explicitly—with someone else to distribute drugs." *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010). Proving a conspiracy requires more than simply showing that the individuals involved agreed to consummate a number of drug deals. Instead, "the government must offer evidence establishing an agreement to distribute drugs that is distinct from evidence of the agreement to complete the underlying drug deals." *Vallar*, 635 F.3d at 286 (internal citations omitted). The government may prove the existence of this agreement through circumstantial evidence. *United States v. Carrillo*, 435 F.3d 767, 776–77 (7th Cir. 2006).

When evaluating the sufficiency of the government's circumstantial proof of an agreement to distribute, we "consider the totality of the circumstances … tak[ing] into account all the evidence surrounding the alleged conspiracy and mak[ing] a holistic assessment" of whether the evidence could support the verdict. *See United States v. Brown*, No. 12-2743, 2013 WL 4048243, at *8 (7th Cir. Aug. 12, 2013). Although this approach allows for the examination of many types of evidence indicative of conspiracy, some forms of evidence are more powerful than others. *See id.* ("True, repeated consideration of similar circumstances seems to have identified a few *per se* rules."). For example, "[a] consignment sale that permits the middleman to return the unused drugs is quintessential evidence of a conspiracy." *Johnson*, 592 F.3d at 755 n.5. Consignment sales suggest an agreement between the seller and purchaser to engage in retail drug distribution "because neither party profits until the middleman distributes the drugs to others." *Id.*; *see also Brown*, 2013 WL 4048243, at *5 ("[A] consignment arrangement also exhibits another key attribute we have stressed in identifying

conspiracies: an actively pursued course of sales") (internal quotation marks omitted).

In this case, the government presented enough evidence for a reasonable jury to find that Claybrooks and Atkins knowingly agreed to form a cocaine distribution enterprise. Atkins's testimony regarding the consignment sales between Claybrooks and him constituted strong evidence of a distribution conspiracy. *See Johnson*, 592 F.3d at 755 n.5. Atkins routinely supplied Claybrooks with large quantities of cocaine, allowed him to pay for the drugs after reselling them to customers, and permitted him to return the cocaine if he could not sell it at retail. The nature of their business relationship indicates that both men were aware of, and consented to, Claybrooks's retail distribution activities. Moreover, Atkins testified that he provided drugs to Claybrooks on this basis for seven years, a lengthy period of collaboration suggestive of a conspiracy. *Cf. United States v. Contreras*, 249 F.3d 595, 599–600 (7th Cir. 2001) (finding insufficient evidence of conspiracy in absence of "prolonged cooperation" with alleged co-conspirator).

Apart from the consignment sales, other aspects of Claybrooks's relationship with Atkins supported the existence of an agreement between them to distribute drugs. For example, Atkins testified that Claybrooks acted as his agent by identifying customers willing to purchase cocaine in bulk from Atkins. *See United States v. Payton*, 328 F.3d 910, 912 (7th Cir. 2003) ("[W]hen the … seller is assisted by a third person, *that* collaboration is punishable as a conspiracy … because the conspirators are on the same side of the sale") (emphasis in original). Furthermore, recorded conversations demonstrated that Atkins advised Claybrooks on certain aspects of

his operation, including the proper method for sampling co-caine. *See Johnson*, 592 F.3d at 755–56 (listing "indication that one party advised the other on the conduct of the other's business" among factors suggestive of conspiracy). When viewed in the light most favorable to the government, a reasonable jury could easily infer that Claybrooks knowingly entered into an agreement with Atkins to distribute cocaine.

**B. District Court's Drug Quantity Finding Was Inadequate and Constituted Clear Error**

Claybrooks maintains that the district court erred at sentencing by failing to make a determination of the amount of drugs attributable to him as a result of his conspiracy conviction. We review a district court's factual findings at sentencing, including the quantity of drugs involved in an offense, for clear error. *See United States v. Thomas*, 510 F.3d 714, 725 (7th Cir. 2007). Under this standard, "[w]e will not upset a district court's factual findings unless we are 'left with the definite and firm conviction that a mistake has been committed.'" *United States v. Williams*, 718 F.3d 644, 649 (7th Cir. 2013) (quoting *United States v. Sauerwein*, 5 F.3d 275, 278 (7th Cir. 1993)).

For those defendants convicted of drug-related offenses, a determination of the quantity of narcotics involved in their offense forms an essential part of the sentencing analysis. District courts "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "The first step in that calculation is to ascertain the correct base offense level." *United States v. Dean*, 574 F.3d 836, 845 (7th Cir. 2009). For drug crimes, a defendant's base offense level is largely a function of the amount of drugs involved in his offense. *See*

*United States v. Beler*, 20 F.3d 1428, 1432 (7th Cir. 1994); *see also* U.S.S.G. § 2D1.1. In light of the significance attached to the amount of drugs involved in a defendant's offense, "we require that a sentencing court make an explicit drug-quantity finding" to facilitate appellate review of the ultimate sentence. *United States v. Palmer*, 248 F.3d 569, 571 (7th Cir. 2001).

At first glance, the transcript suggests that the district court did render a drug quantity finding by stating that "we're pretty secure based on the testimony in going with the PSR, which is 5 to 15 kilograms." Ordinarily, a court's adoption of the PSR findings would be enough to satisfy us that the district court rendered a specific determination of the amount of drugs involved. *See United States v. Are*, 590 F.3d 499, 525 (7th Cir. 2009) ("[W]here the district court adopts the PSR's findings … [it] rarely needs to add details").

But the court did not stop there. Instead, it explicitly questioned the reliability of the evidence cited by the Probation Office to support its drug quantity calculation. During a lengthy discussion of the problematic aspects of Atkins's testimony, the court mentioned his statement that Claybrooks provided him with one kilogram of cocaine on three or four occasions:

> So we've got [Atkins] talking about a relationship that started with dealing 4.5-ounce quantities and over time became a relationship where there were kilos transferred, but he never told us how many kilos a year were transferred. He just said the relationship actually grew to that. So I think that—and then, you know, we've got three or four times he says that he thinks the defendant provided him with a kilo.

This was no minor quibble. The Probation Office used this portion of Atkins's testimony as the basis for finding that Claybrooks's drug conspiracy conviction involved three kilograms of cocaine. Given that the PSR concluded that a total of seven kilograms were involved, the district court's statement constituted a significant challenge to the Probation Office's finding. When these three transactions are removed from the equation, the remaining evidence cited by the PSR only adds up to four kilograms, not the "5 to 15 kilograms" announced by the district court. In light of the district court's discomfort with the underlying evidence, we are convinced that the court did not adopt the Probation Office's conclusion on this point. *See Dean*, 574 F.3d at 845 n.12 (concluding that district court did not accept drug quantity finding when district court made statements "at odds with the finding in the PSR").

Despite refusing to credit the evidence supporting a significant portion of the PSR's drug quantity finding, the district court nonetheless settled on "5 to 15 kilograms" as an acceptable compromise, or halfway point, between the jury's drug quantity finding and the amount urged by the government:

> Well, I think that Atkins'[s] testimony about the 20 to 30 kilos is too indefinite for me to even find that it satisfies preponderance. I actually think that the probation office's compromise between Atkins'[s] estimate, which he didn't pin down at all, and the jury's finding, which was minimal, is probably the safest thing to do in this case.

This is not the same thing as determining the quantity of drugs that were involved in an offense. *See id.* at 845 (con-

cluding that district court's attempt to "'split the difference'" between drug quantity in PSR and jury's finding did not equate to independent determination of drug amount). We recognize that calculating the amount of drugs involved in a particular offense is an inexact science. In making this determination, a court must necessarily engage in "*some amount of reasoned 'speculation and reasonable estimation.'*" *United States v. Hollins*, 498 F.3d 622, 631 (7th Cir. 2007) (emphasis in original). But a district court cannot simply select a number without at least some description of the reliable evidence used to support the finding and the method used to calculate it. *See United States v. Jarrett*, 133 F.3d 519, 530–31 (7th Cir. 1998) (distinguishing permissible finding with others in which the quantity was "pulled out of thin air"). Based on the sentencing hearing transcript, we cannot discern what reliable evidence the district court relied upon to arrive at the "5 to 15 kilograms" drug quantity. The court did not clearly adopt the evidence cited by the PSR. Instead, the court disputed the reliability of the testimony supporting a substantial part of the PSR's drug quantity finding, and it did not provide any alternative evidentiary rationale to make up for the deficiency. Without such an explanation, we must conclude that the district court clearly erred by not making any finding on this important question. *See United States v. Fox*, 548 F.3d 523, 532–33 (7th Cir. 2008) ("Although a district court's findings of relevant conduct are reviewed only for clear error, even such deference cannot cure an absence of findings on key elements of the analysis").

## C. District Court Must Apply *Alleyne* On Remand

Aside from rendering a finding as to the amount of drugs involved in Claybrooks's offense, on remand the district

court should also set the mandatory minimum in a manner consistent with recent Supreme Court precedent. After oral argument in this case, the Supreme Court issued its decision in *Alleyne v. United States*, 133 S. Ct. 2151 (2013). In *Alleyne*, the Supreme Court overruled *Harris v. United States*, 536 U.S. 545 (2002), which held that the Sixth Amendment allows judges to independently determine facts that raise a defendant's mandatory minimum sentence. *Harris*, 536 U.S. at 565. In *Alleyne*, the Court reversed course and decided that the Sixth Amendment and the Fifth Amendment's Due Process Clause require a jury to determine any fact that increases the mandatory minimum punishment for an offense. *Alleyne*, 133 S. Ct. at 2162–63.

After *Alleyne*, Claybrooks's mandatory minimum sentence must be determined by the drug quantity described in the jury's special verdict form. *Cf. Blakely v. Washington*, 542 U.S. 296, 303 (2004) (holding that statutory maximum for Sixth Amendment "purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*") (emphasis in original). Because the jurors concluded that Claybrooks's drug conspiracy conviction involved more than 500 grams but less than 5 kilograms of cocaine, his mandatory minimum sentence is 10 years' imprisonment. 21 U.S.C. § 841(b)(1)(B). This is the mandatory minimum sentence for this case. The district judge cannot raise the mandatory sentencing floor based on its own determination that Claybrooks's offense involved additional amounts of narcotics beyond those determined by the jury. *Cf. Alleyne*, 133 S. Ct. at 2162 ("[I]f a judge were to find a fact that increased the statutory maximum sentence, such a finding would violate the Sixth Amendment").

Although judicially determined facts are no longer relevant to deciding the applicable mandatory minimum, a district court should continue to make whatever factual findings are needed to calculate a defendant's advisory Guidelines range. *See id.* at 2163 ("Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury"); *United States v. Booker*, 543 U.S. 220, 233 (2005) ("[W]hen a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant"); *Apprendi v. New Jersey*, 530 U.S. 466, 481 (2000) ("[N]othing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute") (emphasis in original). On remand, the district court must independently determine the amount of cocaine involved in Claybrooks's offense in order to calculate his advisory sentencing range under the Guidelines. *See generally Gall*, 552 U.S. at 49.[1]

---

[1] Following the Supreme Court's decision in *Alleyne*, we asked the parties to file supplemental briefing on the effect, if any, of the Court's decision on the sentencing in this case. In response, each side filed a supplemental brief discussing whether Claybrooks's sentence violated his rights under the Sixth Amendment. While we thank the parties for their efforts, we need not decide the issue in light of our remand based on the absence of a drug quantity determination. At resentencing, the district court will of course ensure that sentence is imposed consistent with the Supreme Court's decision in *Alleyne*.

### III. CONCLUSION

We AFFIRM Claybrooks's conviction. We VACATE Claybrooks's sentence and REMAND for resentencing consistent with this opinion.