In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 13-3863 & 13-3910

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER SAUNDERS and RASHID BOUNDS,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 1:12-cr-00589-2, 1:12-cr-00589-3 — **Rubén Castillo**, *Chief Judge.*

_____

ARGUED JANUARY 22, 2015 — DECIDED JUNE 10, 2016

_____

Before EASTERBROOK, MANION, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Christopher Saunders and Rashid Bounds sold heroin on the west side of Chicago. They were indicted, and went to trial. A number of their co-conspirators testified against them, and they were convicted of conspiring to distribute at least 100 grams but less than one kilogram of heroin. At sentencing, the district court held them responsible

for between three and ten kilograms of heroin and sentenced each of them to 216 months' imprisonment. On appeal, the defendants contend that the court erroneously denied their motion to exclude the government expert's fingerprint testimony because the government's pretrial disclosures did not sufficiently disclose the basis of the expert's opinion. While we agree that the government's disclosure failed to meet the requirements of Federal Rule of Criminal Procedure 16, we find the error to be harmless because there was overwhelming evidence of the defendants' guilt. Saunders and Bounds also contend that the court erroneously admitted a stipulation regarding a traffic stop of two alleged co-conspirators who drove away from the police while tossing packets that resembled heroin from their car. But we find that the stipulation was relevant to the government's drug conspiracy case and its prejudicial effect did not outweigh its probative value. Finally, the defendants appeal their sentences, arguing that the jury specifically found that less than one kilogram of heroin was involved and the district court erred by reexamining that finding. However, we find that the special verdict form, properly interpreted, does not contain such a finding from the jury. So the district court did not err in finding that more than one kilogram was involved. In addition, defendants contend that the district court erred in failing to articulate a methodology for arriving at its drug quantity finding. We do not agree. The district court properly identified and articulated a reliable basis for its calculation of the drug quantity. Therefore, we affirm the defendants' convictions and sentences.

## I. BACKGROUND

In July 2012, defendants Christopher Saunders and Rashid Bounds, along with Joenathan Penson and Terrence Penson,

were charged with conspiring to possess with intent to distribute and to distributing heroin in violation of 21 U.S.C. §§ 841 and 846. The indictment alleged that they conspired with David Price and others to sell heroin in Chicago. Saunders and Bounds were tried jointly before a jury, and were found guilty of conspiring to possess and distribute at least 100 grams, but less than one kilogram, of heroin.

At trial the government called as witnesses Mokece Lee, Joenathan Penson, and James Brown, who each pled guilty. They testified that the defendants were their co-conspirators in the heroin trade. That conspiracy began no later than November 2007 and lasted until at least March 2008, and Price, another co-conspirator, supplied heroin for distribution to the defendants and others on the west side of Chicago. The defendants managed and supervised specific blocks where the heroin was sold to lower-level workers. The resulting profits were split with Price and sometimes other co-conspirators.

Throughout the conspiracy, the base of operations was an apartment under Price's control known as "Up Top." While no one lived at Up Top, the defendants had keys to the apartment. Access to Up Top was, with a few exceptions, limited to those involved in the conspiracy. The defendants and their co-conspirators mixed Price's raw heroin with Dormin, a sleeping pill, to create larger quantities of product. They packaged the heroin mixtures, took turns making deliveries, and collected money from the purchasers.

As part of a task force investigation by the Chicago Police Department, surveillance photographs and videos were taken at Up Top. The surveillance revealed that the defendants and other co-conspirators were coming and going to Up Top during the conspiracy period. The investigation also produced

evidence from six weekly trash pulls from outside Up Top. Evidence of heroin mixing and packaging was found, including Dormin bottles, cardboard Dormin containers, red plastic capsules, aluminum foil pieces, plastic baggies and their empty cardboard containers, and spools of tape. From this evidence, a forensic chemist also found trace amounts of heroin and diphenhydramine, the active ingredient in Dormin, and a fingerprint specialist, Joseph Ambrozich, found latent prints that matched the defendants' fingerprints.

## A. The Rule 16 Disclosure

Because Ambrozich was to testify for the government as an expert witness, the government filed a Rule 16 disclosure. *See* Fed. R. Crim. P. 16(a). The disclosure explained the Analysis, Comparison, Evaluation and Verification (ACE-V) method of fingerprint examination, the method Ambrozich used to find a match. The Rule 16 disclosure explained the four steps of the ACE-V method, noting that in the second step, the fingerprint expert compares how many matching points of verification are found in the prints. These points of verification, sometimes called Galton points, are what justify a conclusion of a positive fingerprint identification. But the government did not disclose how many matching Galton points Ambrozich found during the examination or what the points were.

Because the number of Galton points was missing from the Rule 16 disclosure, the defendants moved to strike the expert opinion. That motion was denied, and the district court allowed the expert testimony, without requiring pre-trial disclosure of the number of points or offering any other remedy to the defendants. During trial, the government questioned Ambrozich about the number of Galton points he used to

match the fingerprints, and he responded that there is no set number of points required to make a positive identification in the United States. Instead, he testified as to his personal preference of finding at least ten or twelve points of identification, which he said made him a conservative fingerprint examiner as compared to other examiners. He stated that in this case he found between twelve and twenty shared points of identification between the latent prints from the trash pulls and the defendants' fingerprints. During cross-examination, Ambrozich acknowledged that because there is no set standard in the United States, experts might differ not only in the number of points required, but in what qualifies as a point of identification as well.

The jury found the defendants guilty, and they moved for a new trial, partly on the basis of the government's failure to provide an adequate Rule 16 disclosure for the fingerprint expert. The district court denied the motion, concluding that the defendants had received a fair trial and had not been unfairly prejudiced by the government's incomplete disclosure.

### B. Traffic Stop Stipulation

At trial, the district court also admitted a stipulation regarding a November 16, 2007 traffic stop involving Price and a man named Keith Carr. The defendants stipulated to the content of the police officers' statements regarding the traffic stop, but objected to the stipulation's relevance. The stipulation stated that on November 16, Chicago police officers saw two men enter a black Ford SUV after leaving Up Top. They followed the car and attempted to pull it over. As the officers left their car, the SUV sped off and during the pursuit, small objects, later identified as tinfoil packets of heroin, were thrown out of the windows. Eventually, the police pulled over

the car and identified Carr and Price. During the incident, the police obtained permission to search Price's phone and found a contact named "Bleek," which is what Bounds was known as among his co-conspirators. Although the defendants agreed to the contents of the stipulated testimony, they objected to its relevance. The judge overruled the objection, finding the evidence relevant to the government's overall theory of the case that Saunders and Bounds were involved in a drug conspiracy.

### C. Jury Verdict and Sentencing

At the conclusion of the evidence, the jury received a special verdict form which stated that if the jury found the defendants guilty of involvement in a heroin conspiracy, it was to determine the type and amount of controlled substances involved in each offense. The options on the verdict form were: (1) a detectible amount but less than 100 grams of mixtures containing heroin; (2) at least 100 grams of mixtures containing heroin but less than 1,000 grams; or (3) 1,000 grams or more of mixtures containing heroin. The jury selected option 2, indicating that the defendants' offense involved at least 100 but less than 1,000 grams of mixtures containing heroin.

At sentencing, the government argued for a higher drug quantity than the jury found. In its view, the jury was asked to find a drug quantity solely to determine the applicable mandatory minimum and maximum sentences. It contended that the drug quantity issue should be revisited, and proposed that more than 10 kilograms of heroin were involved in the conspiracy. The government based its proposed calculation on the number of Dormin bottles retrieved from the trash pulls, along with testimony of co-conspirators regarding the heroin to Dormin ratio in the mixtures created at Up Top. The

government argued that although it did not present evidence
of ten kilograms of heroin mixtures, it presented 143 empty
Dormin bottles from the six weekly trash pulls, which would
produce 3.69 kilograms of heroin mixtures. It further con-
tended that those 143 bottles were collected over a time period
of only six weeks of a four-month conspiracy, and so for the
entire four months, the drug quantity would be 14.4 kilo-
grams.

The defense argued that the jury's drug quantity selection
indicated that it did not find the cooperating witnesses' testi-
mony, including the quantity of drugs involved in the con-
spiracy, to be credible. Ultimately, the district court denied the
government's request to hear new evidence regarding the
quantity involved in the defendants' charged offense, stating
that because it had doubts about the precision of the mixtures
created at Up Top, it refused to sentence the defendants based
on guesswork. However, the court found that it could safely
determine by a preponderance of the evidence standard that
3 to 10 kilograms of heroin were involved in the charged
crime. The court based its calculations on the ratio of heroin
to Dormin (5 grams to 13 grams), and the fact that 143 Dormin
bottles were recovered, to make a finding of 3.69 kilograms.
The calculation provided room for error because the 143 Dor-
min bottles were collected in only six weeks of the four-month
conspiracy.

The district court's drug quantity finding put the defend-
ants at an adjusted Guidelines level of 37, with a sentencing
range of 262–327 months. If the court concluded that less than
one kilogram of heroin was involved, the defendants' maxi-
mum Guidelines level would have been 33, with a sentencing
range of 168–210 months. Ultimately, the defendants were

sentenced below the Guidelines range determined by the district court to 216 months in prison. Saunders and Bounds appeal their convictions and sentences.

## II. ANALYSIS

The defendants raise four arguments on appeal. Two are evidentiary and two are related to their sentencing. We will discuss each in turn.

### A. Evidentiary Issues

On appeal, the defendants challenge two evidentiary decisions. First, they argue that the district court abused its discretion in admitting the government's fingerprint expert testimony without requiring the government to disclose the bases and reasons for the expert's opinions. Second, they claim that the district court erroneously admitted the stipulation regarding the traffic stop of Carr and Price.

#### 1. Expert Disclosure Insufficient, But Harmless Error

Specifically, the defendants contend that the district court erred in admitting testimony of the government's fingerprint expert, Ambrozich, without requiring the government to disclose before trial the number of Galton points Ambrozich used to make a positive fingerprint identification. We review the district court's denial of the defendants' motion to exclude for abuse of discretion. *United States v. Stevens*, 380 F.3d 1021, 1025 (7th Cir. 2004). If the district court abused its discretion in erroneously admitting evidence, we would reverse and remand for a new trial only if the error was not harmless. *United States v. Thornton*, 642 F.3d 599, 604 (7th Cir. 2011); *United States v. McGee*, 408 F.3d 966, 981 (7th Cir. 2005); Fed. R. Crim. P. 52(a).

The first step in our harmless error analysis is to determine whether there was actual error, which in this case would be a Rule 16 violation. Federal Rule of Evidence 702 requires expert testimony to be based on sufficient facts or data, and to be the product of reliable scientific or other expert methods that have also been reliably applied. And for expert testimony to be admissible, the proponent of the evidence must establish that the expert's testimony is reliable (and relevant) by a preponderance of the evidence. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 592–93 (1993). In criminal cases when the government seeks to call an expert witness, the government must at the defendant's request provide a summary of any expert testimony the government intends to use, including "the witness's opinions, the *bases and reasons* for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G) (emphasis added). We agree with the defendants that the government's Rule 16 disclosure was insufficient because it failed to provide the number of points of identification that were the basis for Ambrozich's opinion that the fingerprints were a match. *See United States v. Robinson*, 44 F. Supp. 2d 1345, 1347–48 (N.D. Ga. 1997) (excluding fingerprint testimony for failure to comply with defendant's request for disclosure of documentation of the points of comparison relied on by expert to make identifications).

The government makes much of the fact that its disclosure discussed the ACE-V method, which the expert used to conclude that the defendants' fingerprints matched the trash pull evidence. The ACE-V method is "the standard method for determining whether two fingerprints are from the same person." *United States v. Herrera*, 704 F.3d 480, 484 (7th Cir. 2013). But the ACE-V method is a process. It is not the basis or reason for an expert's conclusion any more than the scientific

method is the basis or reason for other scientific conclusions. We have found the ACE-V method to be sufficiently reliable under *Daubert*. *Id.* at 484–87. But this case is about disclosure of the basis and reasons for the expert opinion, not the reliability requirement of *Daubert* for admission of expert testimony.

The ACE-V method begins with a three-level analysis of whether the latent print is of value. The examiner starts with level 1 characteristics, which are the familiar pattern of loops, arches, and whorls that are generally visible to the naked eye. *United States v. Mitchell*, 365 F.3d 215, 221 (3d Cir. 2004). At level 2, the examiner analyzes the more detailed characteristics of the fingerprint, including "ridge characteristics" which are the patterns of islands, dots, and forks formed by the ridges. *Id.* The points where those ridges terminate or bifurcate are often referred to as Galton points. *Id.* "The typical human fingerprint has somewhere between 75 and 175 such ridge characteristics." *Id.* Finally, at level 3, the examiner looks at the microscopic variations in the ridges, which are the most vulnerable to distortion. *Id.*

After the analysis of the fingerprint, the examiner proceeds to the comparison step, comparing what he found on the latent fingerprint to what is found on a known fingerprint. *Id.* at 222. An evaluation is made as to whether there is sufficient similarity to declare a match. *Id.* The last step of the process involves a verification where another examiner repeats the observations to see if he comes to the same conclusion. *Id.*; *Herrera*, 704 F.3d at 484. So the ACE-V method boils down to recognizing and categorizing distinctive features in prints and "it is the *distinctiveness of these features*, rather than the ACE-V method itself, that enables fingerprint examiners to

match fingerprints." *Id.* at 485 (emphasis added). The distinctiveness of these features—whether referred to as Galton points, points of comparison, points of verification, or ridge characteristics—are what Ambrozich used to determine that the fingerprints in this case were a match.

The government contends that "the absence in the expert's report of a set number of Galton points on which he relied for his conclusions … did not mean that his opinion had no basis." But in this very statement the government concedes that the number of Galton points *is* the basis of the expert's opinion because it is what the expert "relied" on for his conclusion. The absence of the number of points in the report does not mean that his opinion has no basis, but it does mean that he has failed to disclose his basis.

The government argues that because there is no governing standard for how many Galton points are required to justify a fingerprint match, its Rule 16 disclosure was adequate. But the lack of a nationally accepted number of Galton points to make a fingerprint match does not undermine the importance of the number of Galton points here. For some fingerprint experts, and seemingly, for Ambrozich, the number of points is the basis for the determination that there is a match. *See Mitchell*, 365 F.3d at 222 ("An *n*-point match refers to a match between an unknown latent print and a known full print in which the examiner has identified *n* corresponding Galton points in the correct geometry relative to one another. A number of jurisdictions both outside the United States and within seem to rely on a system where a minimum number of corresponding points must be found before a match may be declared, irrespective of Level 3 detail."). Some experts use an alternative approach that combines quantity and quality

whereby "[i]f ridge characteristics are abundant, then the quality of Level 3 detail is unimportant; but a paucity of Galton points can be compensated for by high-quality Level 3 detail." *Id.* We make no statement today about the preferred method of fingerprint identification or what methods are sufficient under *Daubert*. Instead, we apply the plain language of Rule 16. Whatever standard a fingerprint expert chooses to use to determine a match—whether it be a set number of Galton points or a combination of points and quality—the basis for the opinion that two prints are a match must be disclosed, upon the defendants' request.

In fact, being such a crucial, yet subjective, variable in the process arguably makes the number of points and what those points are even more important. Without knowing the Galton points used by the government's expert in advance, a defendant's ability to prepare an attack on the validity of the identification may be hindered. *See Robinson*, 44 F. Supp. 2d at 1346 (finding that the defendant's expert was unable to review the basis of the opinion rendered by the government's fingerprint expert where the government did not properly disclose the location of each point of comparison).

Having concluded it was error not to disclose the Galton points we must still determine whether the error was harmless. In determining whether an evidentiary error is harmless, we consider whether the prosecution's case would have been significantly less persuasive in the mind of the average juror if the erroneously admitted evidence had been excluded. *Thornton*, 642 F.3d at 605. Here, there was an abundance of other evidence supporting the government's case against the defendants. The surveillance photographs and videos of the

defendants coming and going from Up Top, the physical evidence from the trash pulls, and the testimony of the co-conspirators are all pieces of evidence that make the government's case a strong one. So without the fingerprint testimony, there was plenty of strong evidence for the jury to determine the defendants' guilt, and the government's case would not have been significantly less persuasive. While the district court should have required the government to supplement its disclosure, admission of the evidence was harmless.

## 2.  Traffic Stop Stipulation Properly Admitted

Next, the defendants argue that the district court erred in admitting a stipulation relating to the flight and traffic stop of Carr and Price on November 16, 2007. They assert that the evidence was irrelevant and that even if it was relevant, its prejudicial effect outweighed its probative value under Federal Rule of Evidence 403. Normally, we review a district court's decision to admit evidence for abuse of discretion and will reverse and order a new trial only if the evidentiary error was not harmless. *United States v. Boone*, 628 F.3d 927, 932 (7th Cir. 2010). However, the defendants only objected on relevancy grounds at trial, and that kind of objection does not preserve an error under FRE 403. *United States v. Wilson*, 966 F.2d 243, 246 (7th Cir. 1992). Since the defendants forfeited their FRE 403 challenge by not raising it to the district court, we review now only for plain error. *See id.*; *see also Cloe v. City of Indianapolis*, 712 F.3d 1171, 1181 n.6 (7th Cir. 2013). Before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain and (3) that affects substantial rights. *United States v. Price*, 418 F.3d 771, 785 (7th Cir. 2005). Since we

have concluded that there was no error in admitting the stipulation, we will not address the other prongs of the plain error test.

The district court was correct to admit the traffic stop evidence because it was clearly relevant as it helped to establish the government's theory that Price headed a conspiracy to distribute heroin based out of Up Top. The presence of heroin packets inside the car with Price, when it left Up Top, was relevant to the question of whether the defendants and their co-conspirators conspired at Up Top to distribute heroin supplied by Price.

The defendants claim that there was not adequate evidence to show that Carr's and Price's actions on November 16 furthered the conspiracy in which they participated. Specifically, they rely on a statement made by co-conspirator Lee on cross-examination—that Lee had been involved in two different heroin conspiracies, one from 2007 to 2008 that included the defendants and one from 2009 to 2010 that included Carr—to suggest that Carr was not involved in a conspiracy with the defendants. But Lee's statement was just a reference to the fact that he was under indictment for the 2009–2010 conspiracy in a separate case in front of Judge Bucklo, and that he was not under indictment for the 2007–2008 conspiracy which is the subject of this case. He did not say that Carr did not participate in the 2007–2008 conspiracy. In fact, witnesses at trial, including Lee, testified that Carr was involved in distributing heroin supplied by Price during the same time as the defendants.

In the alternative, defendants argue that even if the evidence was relevant, it was unduly prejudicial. Evidence is unfairly prejudicial if it induces the jury to decide the case on an

improper basis rather than on the evidence presented. *United States v. Conner*, 583 F.3d 1011, 1025 (7th Cir. 2009). Here, the defendants argue that the evidence was unfairly prejudicial because it could have caused the jury to improperly impute the crimes of others to the defendants and because it allowed the government to unfairly lend credence to the testimony of co-conspirators by using the testimony of law enforcement. But the evidence was not unfairly prejudicial. Surveillance evidence had already established the presence of the defendants at Up Top, and the co-conspirators' testimony had established their involvement in the conspiracy. The very nature of a conspiracy charge is that co-conspirators may sometimes be held accountable for the wrongful acts of other members of the conspiracy. The stipulation had probative value because heroin was found in the possession of co-conspirators after they left the headquarters of the conspiracy. Under these circumstances, the probative value of the stipulation was not substantially outweighed by any unfair prejudice.

### B. Sentencing Issues

The defendants also raise two issues related to their sentencing. First, they argue that the jury specifically found that less than one kilogram was involved in the offense, and the district court should not have reconsidered that finding. Second, they contend that the district court erred in reaching its drug quantity finding by failing to articulate a reliable methodology for arriving at the number. When reviewing sentencing determinations under the Guidelines, we review the district court's legal conclusions de novo and its findings of fact for clear error. *United States v. Smith*, 308 F.3d 726, 743–44 (7th Cir. 2002).

### 1. Jury Finding of Drug Quantity

The defendants argue that the jury determined that the conspiracy involved less than one kilogram of mixtures containing heroin, and that determination precluded the judge from finding that the conspiracy involved more than one kilogram. At the conclusion of the trial, the court gave the following instruction to the jury:

> If … you find the defendant guilty as charged in Count One, you will be required to determine separately the quantity of controlled substances that you find the government has proved. I will address this further when I discuss the verdict form with you.

The government submitted, and the district court adopted, a form which reads as follows:

> … [W]e, the jury, find that the offense charged in the indictment involved the following type of controlled substances in the amount shown below.
>
> (A)    Mixtures containing heroin
>           [check one line only]
>
> 1000 grams or more of mixtures                    _____
> containing heroin
> At least 100 grams of mixtures
> containing heroin but less than                    ———
> 1000 grams

> A detectable amount but less than
> 100 grams of mixtures containing                ———
> heroin

The jury marked the second line. The instructions on the actual verdict form that precede the drug quantity amounts are somewhat inconsistent. First they ask the jury to "find the type and amount of controlled substances involved in the offense charged in the indictment *that have been proved* beyond a reasonable doubt" (emphasis added). The form then defines the type and amount of controlled substances involved in the offense as "the type and amount of controlled substances *that you find*, beyond a reasonable doubt" were involved in the offenses (emphasis added). The defendants argue that the correct reading of the form is that the jury made two distinct factual findings beyond a reasonable doubt: first, that the offense involved more than 100 grams of heroin, and second, that the offense involved less than 1,000 grams of heroin. Their argument is supported by the inconsistent nature of the form. It is unclear on the face of the form whether the jury was being asked to find, beyond a reasonable doubt, the highest possible amount of drugs involved in the conspiracy, or whether it was being asked the highest drug quantity the government *had proven* beyond a reasonable doubt. If the jury was simply deciding the drug quantity the government had proven beyond a reasonable doubt, by checking the second line it was effectively acquitting the defendants of a conspiracy involving more than 1,000 grams of heroin. If instead the jury understood its task to be to *specifically find* the quantity of drugs involved in the conspiracy, then by checking the second option it was not merely acquitting the defendants of a conspiracy

involving more than 1,000 grams of heroin, it was finding be-yond a reasonable doubt that defendants *did not* participate in such a conspiracy. The defendants argue that the second read-ing is the correct one, and by selecting the second option, the jury was convinced, beyond a reasonable doubt, that the amount of drugs involved in the conspiracy was less than 1,000 grams.

We disagree. While the form is somewhat confusing, the most logical interpretation is that the jury was being asked to select the heroin quantity that the government had proven be-yond a reasonable doubt. By checking the second option, the jury merely found that the government had failed to carry its burden to prove beyond a reasonable doubt that more than 1,000 grams of heroin were involved. There are several rea-sons that this is the most plausible reading of the form. First, the government always carries the burden of proof in a crim-inal case, and part of its burden is to establish *threshold* drug quantities beyond a reasonable doubt to establish statutory penalty ranges. *See Alleyne v. United States*, 133 S. Ct. 2151 (2013). The jury was reminded of the government's burden when it received instructions about its findings of guilt. It makes little sense that the jury would construe the govern-ment's efforts in prosecuting the defendants to be "proving" that the conspiracy involved *less* than a certain drug quantity. Second, throughout the trial, it was clear that the govern-ment's intent was to prove the conspiracy involved a *higher* quantity of drugs than 1,000 grams. The indictment charged the defendants with a conspiracy involving 1,000 grams *or more* of heroin. Third, neither party introduced any evidence supporting or even suggesting that the drugs involved were less than 1,000 grams—a fact that the defendants now insist was proven beyond a reasonable doubt. And finally, both the

drug quantity verdict instruction and the special verdict form explicitly ask the jury to determine what drug quantity the government *has proved*. So while the form may have been imprecise, the jury was clearly apprised that its role was to determine if the government had met its burden of proof.

Because we believe the form cannot be properly read as a factual finding that less than 1,000 grams were involved, the sentencing court was permitted to find a higher drug quantity by a preponderance of the evidence. *See United States v. Watts*, 519 U.S. 148, 157 (1997) (per curiam) (explaining that judicial fact-finding of acquitted conduct is permissible because a jury cannot be said to have "necessarily rejected" any facts when it returns a general verdict of not guilty); *Alleyne v. United States*, 133 S. Ct. 2151, 2169 (2013) (Roberts, C.J., dissenting) ("the judge was free to consider any relevant facts … including facts not found by the jury beyond a reasonable doubt").

However, it bears mentioning that the court could have avoided this confusion by simply following the Seventh Circuit's Pattern Instruction, which contains a special verdict instruction on drug quantity findings. It recommends instructing the jury to answer "Yes" or "No" to the question of whether the government has proven a specific threshold drug quantity. *See* Pattern Criminal Jury Instructions of the Seventh Circuit, Drug Quantity/Special Verdict Instructions (2012) at 648.[1] Part of the reason for asking "Yes" or "No" questions is

---

[1] The full text of the special verdict pattern instruction reads: "If you find that the government has proven beyond a reasonable doubt that the offense involved [insert quantity; e.g., 5 kilograms or more of cocaine], then you should answer the [first] question 'Yes.' [If you answer 'Yes,' then you need not answer the remaining question[s] regarding drug quantity for

to avoid the confusion that can result from asking the jury to select between different ranges of drug quantities. *See United States v. Washington*, 558 F.3d 716, 718, n. (7th Cir. 2009). While we conclude that the district court did not err in applying *Watts* to the jury's findings, we stress the importance of using the special verdict pattern instruction. In the event that a special verdict instruction is a poor fit, then the court must craft a verdict form that clearly spells out the task given to the jury.

### 2. No Error in District Court's Drug Quantity Methodology and Finding

Finally, the defendants maintain that the district court committed clear error in its drug quantity calculation at sentencing by not articulating a clear basis or methodology for arriving at its heroin quantity finding. We review a district court's determination of the quantity of drugs involved in an offense for clear error. *United States v. Claybrooks*, 729 F.3d 699, 706 (7th Cir. 2013). "We will not upset a district court's factual

---

that count.]. If you find that the government has not proven beyond a reasonable doubt that the offense involved [insert quantity; e.g., 5 kilograms or more of cocaine], then you should answer the [first] question 'No.' If you answer the first question "No," then you must answer the next question. That question asks you to determine whether the government has proven beyond a reasonable doubt that the offense involved [insert lesser quantity; e.g., 500 grams or more of cocaine]. If you find that the government has proven beyond a reasonable doubt that the offense involved [insert lesser quantity; e.g., 500 grams or more of cocaine], then you should answer the second question 'Yes.']. If you find that the government has not proven beyond a reasonable doubt that the offense involved [insert lesser quantity; e.g., 500 grams or more of cocaine], then you should answer the second question 'No.'"

findings unless we are left with the definite and firm conviction that a mistake has been committed." *Id.* (citations omitted).

For defendants convicted of drug-related offenses, a determination of the quantity of narcotics involved is an essential part of the sentencing analysis, as it is often a large determinant of the base offense level. *Id.* Because of the significance attached to the amount of drugs involved in the offense, "we require that a sentencing court make an explicit drug-quantity finding and explain how it arrived at the sentence." *United States v. Palmer*, 248 F.3d 569, 571 (7th Cir. 2001). "A district court cannot simply select a number without at least some description of the reliable evidence used to support the finding and the method used to calculate it." *Claybrooks*, 729 F.3d at 707. Still, we recognize that calculation of the amount of drugs involved is an "inexact science" and we allow some room for "reasoned speculation and reasonable estimation." *Id.* (citations omitted).

The defendants claim that the district court erred in relying on evidence to calculate the drug quantity that it did not fully credit. In their view, there was no description of the reliable evidence used to arrive at the final figure. We disagree. Based on the sentencing transcript, we can readily discern what evidence the district court relied on to arrive at its finding. *Cf. Claybrooks*, 729 F.3d at 707 (reversing sentence where court did not provide a basis for its drug quantity finding). The court's final number—3.69 kilograms—resulted from a mathematics calculation: a ratio of 13 grams of Dormin to 5 grams of heroin and 143 bottles of Dormin recovered during six trash pulls yields 3.69 kilograms of heroin. The district

court initially questioned the reliability of such a precise as-
serted ratio, stating that this was "not Johnson & Johnson"
and the jury's finding indicated some credibility issues with
the cooperating witnesses who testified about the ratio, since
the jury had rejected a higher drug quantity finding. But the
court ultimately accepted that the heroin was mixed at this
ratio when the government responded that Price's heroin was
known for its "trademark" ratio, that he used red tape to wrap
his heroin in order to distinguish it, and that he was known
on the street for having excellent quality heroin because of
this ratio.

While the defendants analogize this case to *Claybrooks*,
where we reversed the district court's drug quantity finding,
*Claybrooks* is distinguishable. In *Claybrooks*, the district court
rejected the methodology used in the Presentence Investiga-
tion Report to arrive at a drug finding, but did not indicate
another basis for arriving at its number. *Id.* at 707. Here, while
the court was initially skeptical about the government's ratio,
it was presented with additional argument as to why the ratio
was accurate and ultimately accepted the ratio as reliable.

The district court did not calculate 3.69 kilograms because
it was "split[ting] the difference" between the government's
theory and the jury's verdict, or selecting a number that was
in the middle simply for the sake of compromise. *Cf.
Claybrooks*, 729 F.3d at 707; *United States v. Dean*, 574 F.3d 836,
845 (7th Cir. 2009). Instead, it based its calculation on the pro-
posed ratio and the actual number of recovered Dormin bot-
tles. Its responses provide enough for us to discern the relia-
ble evidence that it used to make its calculation and we will
not reverse under these circumstances.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the defendants' convictions and sentences.

MANION, *Circuit Judge*, concurring in part and dissenting in part.

I agree with the court's analysis of the evidentiary issues, but disagree with its analysis of the sentencing issues, particularly regarding its treatment of the jury finding as opposed to the district-court finding for the drug quantity involved in Saunders' and Bounds' convictions.

The jury in this case found beyond a reasonable doubt that the drug amount was between 100 grams and 1 kilogram. This necessarily implies that the jury found the offense did *not* involve 3.69 kilograms, but at sentencing, the district court found a 3.69-kilogram amount. These findings are irreconcilable. By its finding, the district court overrode the jury's decision. The Sixth Amendment does not allow this. I dissent from this aspect of the court's decision, but join in all other aspects.

This is the critical piece of the jury form at issue: the jury checked the line stating that the charged offense involved "[a]t least 100 grams of mixtures containing heroin but less than 1000 grams." When interpreting this sentence, the court states that the defendants were convicted of possessing more than 100 grams, but concludes that the jury "was effectively acquitting the defendants of a conspiracy involving more than 1,000 grams of heroin."

A straightforward reading of the jury-verdict form does not allow this court to find an "effective acquittal." The jury does not—in a single sentence, passing judgment on one count—actually convict and effectively acquit. Here, the jury convicted Saunders and Bounds of a capped drug quantity, and its verdict should stand.

The court's decision today is troubling for two reasons: it misinterprets the jury-verdict form and misapplies *United States v. Watts*, 519 U.S. 148, 157 (1997) (per curiam). I briefly address these issues in turn.

## I. The Jury Form States Specific, Binding Findings.

This court treats the jury form as a "somewhat confusing" document which requires "interpretation."[1] As the court writes, this verdict form first asks the jury to "find the type and amount of controlled substances involved in the offense charged in the indictment *that have been proved* beyond a reasonable doubt" (emphasis added). It then discusses "the type and amount of controlled substances *that you find*, beyond a reasonable doubt" (emphasis added). As a matter of law, these phrases present no contradiction. These two concepts merge in the jury-verdict form: "what has been proved" is "what the jury finds." *See*, *e.g.*, *Cunningham*, 549 U.S. at 282 ("must be submitted to a jury, and

---

[1] The form is not confusing. It offered three options: (1) "1000 grams or more of mixtures containing heroin"; (2) "At least 100 grams of mixtures containing heroin but less than 1000 grams"; or (3) "A detectable amount but less than 100 grams of mixtures containing heroin."

If the jury selected its first option, this would have directed the district court to apply the sentencing range found in 21 U.S.C. § 841(b)(1)(A)(i): ten years to life. Under the second option, the district court would apply Section 841(b)(1)(B)(i): five to 40 years. Section 841 would not have been triggered if the jury chose option three.

These are logical options presented to the jury, with serious statutory consequences for sentencing, and the jurors in this case chose a defined amount. They set the confining brackets for the sentencing range.

proved beyond a reasonable doubt."). By suggesting that "what is proved at trial" is different from "what the jury verdict says," the court renders either the trial or the jury superfluous.

When interpreting this supposed conflict, the court concludes that the most logical interpretation is this: when the jury checked the line saying that the offense involved "[a]t least 100 grams … but less than 1000 grams," what the jury actually meant was that "the government failed to prove beyond a reasonable doubt that more than 1,000 grams of heroin were involved." The court's reading switches the standard of proof halfway through the jury-form sentence, from finding that something was established beyond a reasonable doubt ("at least 100 grams") to finding that something was not established beyond a reasonable doubt ("less than 1000 grams"). But this court should not call half of the conviction a conviction and call the other half an acquittal. On its plain language, the jury verdict maintains the same standard of proof through the sentence and makes a simple finding: beyond a reasonable doubt, the defendants had between 100 and 1,000 grams of heroin.

Because the jury-verdict language is clear, any confusion should not be interpreted in the government's favor. The court explains its decision with three reasons: (1) the government carries the burden of proving threshold drug quantities; (2) the government clearly intended to prove that the conspiracy involved more than 1,000 grams of heroin; and (3) neither party introduced evidence that the defendants had less than 1,000 grams. This reasoning has three implications. First, if the government has the burden

of proof, this court will construe jury findings in the government's favor. Second, if the government intended to prove something at trial, questions about whether the jury agreed with the government can be decided based on what the prosecutor sought. Third, if a defendant does not affirmatively introduce evidence that contradicts what the government intends to prove, the benefit of doubt again goes to the government. This set of assumptions removes the need for a jury.

In fact, there is a straightforward way to resolve any confusion about what the jury intended here. If the jury agreed with the government's intended outcome, the jury could have simply checked the line on the jury form which said "1000 grams or more." That answer would have, in the plainest terms, affirmed the argument that the government made at trial.

Instead, the jury filled out its verdict form differently. When asked to indicate "that the offense charged in the indictment involved the following type of controlled substances in the amount shown below," the jury checked this line: "At least 100 grams of mixtures containing heroin but less than 1000 grams." The defendants were convicted of an offense involving that amount and no more. There is nothing ambiguous about this jury finding; there is no acquittal to be found in the conviction. The Sixth Amendment protects this jury decision.

## II.  *Watts* **Is an Acquittal Case, Not a Conviction Case.**

In its ruling today, the court affirms the district court's application of *Watts* to this case. It should not. *Watts* stands

for the simple principle that a sentencing court may con-
sider conduct underlying an acquitted charge if that un-
derlying conduct is proven by a preponderance of the ev-
idence. *Watts*, 519 U.S. at 157. *Watts* is therefore factually
and legally distinguishable from this case. Instead of an
acquittal, this case features an affirmative jury finding of
fact.

An acquittal is a legal conclusion, "not a finding of any
fact," and it "can only be an acknowledgment that the gov-
ernment failed to prove an essential element of the offense
beyond a reasonable doubt." *See id.* at 155 (internal quota-
tion marks omitted). For example, a jury might acquit a
defendant of burglary after he readily conceded that he
broke into a home to steal property, but did so at noon.
Breaking in at night is an essential element of the crime.
When a district judge considers relevant conduct at sen-
tencing, it would be correct for the judge to consider the
breaking and entering; the defendant, after all, conceded
this fact. There is no contradiction. Indeed, the acquittal
says nothing about particular facts except that the govern-
ment lacked enough evidence to prove each element of the
charge. With regard to an acquitted count, the government
may well have proven several predicate facts that the dis-
trict court could later consider when sentencing the de-
fendant for a different, convicted count in the same case.
The government just did not prove all the facts necessary
for a conviction on the acquitted count.

A close reading of *Watts* shows no contradiction be-
tween its jury verdict and its sentencing judge's finding:
the jury there acquitted Vernon Watts of using a firearm in
connection with a drug charge, which simply meant that

the government failed to prove this charge beyond a reasonable doubt. Under those facts, when deciding Watts's sentence on the convicted drug charge, the sentencing judge could find by a preponderance that Watts possessed guns in connection with the drug charge. *See id.* at 150. As the Supreme Court observed, "That [acquittal] verdict does not preclude a finding by a preponderance of the evidence that the defendant did, in fact, use or carry such a weapon, much less that he simply *possessed* the weapon in connection with a drug offense." *Id.* at 157 (emphasis in original). In contrast, the two results in this case cannot square: the defendants cannot have (1) possessed less than 1 kilogram and (2) also possessed 3.69 kilograms. By flatly contradicting the jury's express factual finding, the sentencing judge in this case violated the Sixth Amendment rights of Saunders and Bounds. And if the jury system is to mean anything, this outcome is a problem.

For these reasons, I respectfully dissent.