In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-3270

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOEL J. HELDING,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:18-cr-39 — **William M. Conley**, *Judge.*

ARGUED NOVEMBER 7, 2019 — DECIDED JANUARY 28, 2020

Before HAMILTON, SCUDDER, and ST. EVE, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Police seized 143.7 kilograms of marijuana from Joel Helding's car and apartment, and he pleaded guilty to possessing over 100 kilograms. But at sentencing, the district court held him responsible for the equivalent of 4,679.7 kilograms—over 32 times the amount seized. The additional quantity was based solely on the Presentence Investigation Report's account that confidential informants told law enforcement Helding was dealing significant

quantities of methamphetamine during the relevant period. The drug quantity determination had a sizeable effect on Helding's advisory guidelines range, and it drove his ultimate sentence of 18 years' imprisonment.

A sentencing court acts within its discretion when it credits confidential informants' statements about drug quantity, but when a defendant objects, the evidence supporting that quantity must be found to be reliable. While that step may prove modest, it needs to be taken, lest a defendant face the risk of being sentenced on the basis of unreliable information. The statements here, without more, fell short of that threshold. So we reverse and remand for resentencing.

## I

### A

In January 2018, a confidential informant told Wisconsin law enforcement that Joel Helding and his now-wife, Valerie Flores, planned to drive a substantial amount of methamphetamine from California to Wisconsin. Law enforcement used the informant's tip to obtain a court order to track Flores's phone and thereby monitor the pair's location as they drove. Once Helding and Flores arrived in Wisconsin, state police stopped and apprehended them. The officers then seized 143.7 kilograms of marijuana from Helding's car, while also finding him in possession of two firearms, a 9mm Smith & Wesson and a Ruger LCP .380. A subsequent search of his apartment, undertaken pursuant to a warrant, further uncovered 15.2 grams of marijuana and digital scales containing methamphetamine residue.

A grand jury charged Helding with possessing and intending to distribute more than 100 kilograms of marijuana,

21 U.S.C. § 841(a)(1), and possessing a firearm in furtherance of drug trafficking, 18 U.S.C. § 924(c). Helding pleaded guilty to both counts, which subjected him to a mandatory minimum sentence of 15 years' imprisonment—ten for the drug offense and five consecutive for firearm possession.

B

Under the Sentencing Guidelines, quantities matter in drug cases. The higher the quantity of drugs attributed to the defendant, the higher his offense level, and in turn the higher his sentencing range. See U.S.S.G. § 2D1.1(c). Helding's case provides a stark illustration.

The U.S. Probation Office prepared a Presentence Investigation Report (often shorthanded PSR) in advance of sentencing. In determining drug quantity, the PSR recommended holding Helding accountable for not only the 143.7 kilograms of marijuana that police found in his car and apartment, but also additional quantities based on an application of the relevant conduct rule in the Sentencing Guidelines. See U.S.S.G. § 1B1.3(a)(1)(B) (explaining that for guidelines purposes, where a defendant jointly undertakes criminal activity, the relevant conduct includes all reasonably foreseeable acts and omissions within the scope of and in furtherance of the crime). The application of that rule here meant that the drug quantity determination needed to account for Helding's dealing of both marijuana and methamphetamine.

Methamphetamine quantities entered the PSR through information provided to law enforcement by five confidential sources (and presumably passed to the probation officer by the prosecutor or case agent). According to the PSR, the confidential informants, or CIs, stated that they bought

methamphetamine from Helding several times and relayed information on the quantities, prices, and frequency of those transactions. The PSR reported that CI-1 told law enforcement Helding possessed "over a pound" of methamphetamine on December 16, 2017, and had fronted the informant with a couple of ounces every day or two for two months. CI-1 sold the methamphetamine to others, returned a portion of the proceeds to Helding, and kept the balance as profit. The PSR likewise attributed to CI-1 descriptions of Helding's vehicles and apartment as well as information that Helding supplied methamphetamine to customers in Merrill and Wausau, Wisconsin. In much the same way, the PSR included information from CI-2—specifically, that this individual saw Helding sell "multiple ounces" of methamphetamine on three occasions for $500 per ounce.

So, too, did the PSR include information from three other confidential sources. One of them, CI-1082, was the informant who originally told law enforcement about Helding's trip from California to Wisconsin under the mistaken belief that Helding and Flores were transporting methamphetamine instead of marijuana. The PSR also quoted CI-3 as telling law enforcement that Helding once traded a half-ounce of methamphetamine for a gun. And the PSR quoted CI-987 as saying that Flores regularly sold the informant methamphetamine for $40 to $60 per eighth of an ounce.

From this information the probation officer estimated that Helding possessed and intended to distribute at least 64 ounces of methamphetamine during the relevant period. Where a defendant's conduct involves both marijuana and other drugs, the Sentencing Guidelines convert those drugs into a marijuana equivalency for drug quantity purposes. See

U.S.S.G. § 2D1.1 cmt. 7, 8(B). So, in preparing the PSR here, the probation officer converted the methamphetamine and added it to the 143.7 kilograms of seized marijuana. Helding's drug quantity shot up to 4,679.7 kilograms of marijuana.

Helding's advisory sentencing range likewise jumped through the roof. If he had been responsible for just the 143.7 kilograms of marijuana seized, his offense level would have been 26 and his sentencing range 120 to 150 months for the drug offense. Add to that the five-year minimum he faced for the gun offense, and Helding's total range would have been 180 to 210 months. But when the drug quantity skyrocketed to 4,679.7 kilograms of marijuana, Helding's offense level increased to 32 and his sentencing range to 210 to 262 months. Adding the five years for the firearm offense, Helding's total range became 270 to 322 months. Put most simply, the spike in drug quantity increased the advisory range by over seven years.

This table shows the impact:

| | Drug Quantity | Offense Level | Sentencing Range for Drug Offense Alone | Total Sentencing Range for Drug and Firearm Offenses |
|---|---|---|---|---|
| **Seized Quantity Only** | 143.7 kg marijuana | 26 | 120 to 150 months | 180 to 210 months |
| **Seized Quantity Plus Relevant Conduct Quantity** | 4,679.7 kg marijuana | 32 | 210 to 262 months | 270 to 322 months |

Helding objected to the PSR's inclusion of the methamphetamine, arguing that nothing corroborated what the CIs reportedly told law enforcement. Nor, he added, did the PSR include any explanation of why law enforcement found the CI information credible. Helding's objection was clear: the

case involved no controlled buys with any CI, and the search of his apartment revealed only residual amounts of methamphetamine consistent with personal use.

Helding was right that the PSR said nothing about the reliability of the informants. Nowhere was there any description of their past work with law enforcement, their criminal history, the reliability of the accounts they had provided before, or whether and why the case agents believed the information provided to the probation office was reliable.

The probation office rejected Helding's objection in an addendum to the PSR. The addendum explained that the probation office did not have the means or the responsibility to investigate witness credibility. It stated that only CI-1 and CI-2's statements factored directly into the drug quantity calculation, because those statements were detailed enough to include the dates and quantities of Helding's alleged methamphetamine sales. On the basis of this information, the PSR calculated Helding's advisory range based upon a drug quantity of 4,679.7 kilograms of marijuana—an amount the probation officer saw as "conservative" in light of the accounts of CI-1 and CI-2 supplied by law enforcement. In the end, however, the addendum observed that the drug quantity finding would have no impact on the guidelines calculation because of Helding's status as a career offender.

C

Sentencing began with the district court determining Helding's advisory guidelines range. Helding again objected to the PSR's inclusion of methamphetamine in the drug quantity determination, disputing the accuracy of the CI-supplied information about his methamphetamine sales. The district

court overruled the objection, finding that the government had shown Helding's possession of methamphetamine by a preponderance of the evidence. The court reasoned this way:

> Indeed, as to the quantities, both confidential informants were able to provide specific information related to the defendant's involvement in sales of drugs, including dates and quantities. Absent contrary evidence, therefore, I overrule that objection.

The sentencing judge also observed that three other CIs had provided information regarding Helding's possession of methamphetamine, even though their accounts did not directly factor into the drug quantity calculation.

The district court turned next to Helding's criminal history and found that his two prior felony drug convictions made him a career offender. Helding's career offender status meant his guidelines offense level automatically became 37 regardless of any drug quantity determination. See U.S.S.G. § 4B1.1. The court found that Helding's career-offender sentencing range was 322 to 387 months. From there the district judge recognized that, under our decision in *United States v. Corner*, 598 F.3d 411 (7th Cir. 2010), the court had discretion to refrain from sentencing in strict accordance with the career-offender guideline. *Corner* provides that, while a district court must consider the benchmark set by the career-offender guidelines, the sentencing judge retains the discretion to disagree with and deviate from them on policy grounds. See *id.* at 415–16.

The district court exercised that discretion by considering what Helding's guidelines range would have been if he were not a career offender. The court found that Helding's non-

career-offender base offense level was 32. It then made a few adjustments—a two-level increase because Helding maintained a premises for drug trafficking, see U.S.S.G. § 2D1.1(b)(12), and a three-level decrease because he accepted responsibility, see *id.* § 3E1.1—to arrive at a total offense level of 31. Upon accounting for Helding's firearm offense—and the 60-month minimum sentence mandated by 18 U.S.C. § 924(c)—the court determined that Helding's non-career-offender guidelines range was 248 to 295 months.

The district court took one final step. Recall that Helding faced a total mandatory minimum sentence of 180 months (15 years) for his marijuana and firearm convictions. See 18 U.S.C. § 924(c); 21 U.S.C. § 841(a)(1). The court compared Helding's non-career-offender range to this statutory 180-month minimum and decided that a sentence somewhere in between was appropriate. The court therefore sentenced Helding to 216 months—about halfway between the 180-month mandatory minimum and the lower end of the 248-month non-career-offender range.

Helding now appeals. He emphasizes the importance of the drug quantity determination to his sentence and urges us to hold that the district court needed to do something to find the CI information dependable before relying on it to select an appropriate sentence.

## II

Our reading of the sentencing transcript leaves us with the impression that the district court overruled Helding's objection because the information supplied by the CIs was detailed. While the observation appears accurate, the reasoning came very close to the district court saying it credited the CI

information because of its inclusion in the PSR. What concerns us is that this reasoning prevailed over Helding's objection, with no step being taken to find some modicum of reliability of the CI information supplied to the probation officer charged with preparing the PSR.

More to it, nowhere did the PSR contain any information—even a representation by law enforcement—that the informants' statements were known to be reliable. CI-1 and CI-2 specified the dates and quantities of Helding's alleged drug sales, but specificity alone, in the face of a defendant's objection, does not make information reliable. The court pointed to no other evidence to support the inclusion of methamphetamine in Helding's drug quantity. Nor did the court explain why the CI information in the PSR, standing alone, was sufficient to support such a substantial increase in the drug quantity finding.

Perhaps recognizing this shortcoming in the sentencing record, the government urges us to conclude any error in the district court's drug quantity finding was harmless given Helding's status as a career offender. We decline the invitation. After finding that Helding qualified as a career offender, the district court then pivoted, invoked the discretion we recognized in *Corner*, and ultimately imposed a sentence driven almost exclusively by the guidelines range resulting from the drug quantity finding. In these circumstances—where the exercise of *Corner* discretion sidelined the career offender guideline—we cannot agree that any error with the drug quantity finding was harmless. It is impossible to read the sentencing transcript and not recognize the massive influence the drug quantity finding had on Helding's sentence.

This factual reality has a legal consequence too. A criminal defendant has a due process right to be sentenced based on accurate information. See *United States v. Tucker*, 404 U.S. 443, 447 (1972). Reliability is a central ingredient of the due process analysis: where the district court sentences a defendant based on the drug-quantity guidelines, it must find the government's information sufficiently reliable to determine drug quantity by a preponderance of the evidence. See *United States v. Lister*, 432 F.3d 754, 762 (7th Cir. 2005). We have emphasized that where a district court relies on evidence that substantially increases drug quantity, it must take care in determining the accuracy of that evidence. See *United States v. Morrison*, 207 F.3d 962, 967 (7th Cir. 2000). And all of this is so where, as here, a district court is exercising the discretion recognized in *Corner*. See *Corner*, 598 F.3d at 415 (explaining that "district judges are at liberty to reject any Guideline on policy grounds—though they must act reasonably when using that power").

We have underscored these due process safeguards in addressing previous challenges to the reliability of CI information included in a PSR. Take, for example, *United States v. Marks*, 864 F.3d 575 (7th Cir. 2017). There we recognized the general rule that "a sentencing judge may rely on a presentence report if it is well-supported and appears reliable." *Id.* at 580 (collecting prior cases highlighting the same general rule). Under those circumstances, the defendant bears the burden of coming forward with facts demonstrating that the information in the PSR is inaccurate or unreliable. See *id.*; see also *United States v. Sunmola*, 887 F.3d 830, 839 (7th Cir. 2018) ("Only when the defendant's objection creates real doubt as to the reliability of the information in the PSR does the

government have the burden of independently demonstrating the accuracy of the information.").

But in *Marks* we also took care to caution that where these reliability attributes are altogether absent and the PSR instead asserts "nothing but a naked or unsupported charge," the defendant's denial of that information suffices to cast doubt on its accuracy. *Marks*, 864 F.3d at 580; see also *United States v. Moreno-Padilla*, 602 F.3d 802, 809 (7th Cir. 2010) (describing situations in which the general rule does not apply, such as where the PSR omits crucial information).

This exact consideration applies to Helding's sentence here. We have not held that a district court may credit a drug quantity finding over a defendant's objection where that quantity was based solely on a confidential informant's out-of-court statements, without some further indicia of reliability. We have come close to the issue at least twice. In *United States v. Smith*, 280 F.3d 807 (7th Cir. 2002), we affirmed a gun enhancement that the defendant, Antwone Smith, contended was imposed "solely on the uncorroborated, out of court statement of an unidentified, confidential informant." *Id.* at 810–11. But Smith was mistaken, as the record contained more evidence to support the gun enhancement. A detective testified before the district court that he spoke to the CI immediately after the CI bought drugs from Smith and, in the course of that conversation, the CI told the detective that Smith pointed a gun at the CI. See *id.* at 809. A tenant of the house where Smith sold drugs also testified that she had seen guns there. See *id.* We considered these sources of corroboration in affirming the district court's finding that the informant's statement was sufficiently reliable. See *id.*

A second case implicating the issue was *United States v. Valdez*, 739 F.3d 1052 (7th Cir. 2014). Arturo Valdez admitted to possessing 700 grams of heroin, but at sentencing the district court held him accountable for more than three kilograms. See *id.* at 1052–53. Valdez objected to the drug quantity calculation, arguing that it was improper for the district court to rely on statements made by a CI and recounted in law enforcement reports. See *id.* at 1053. We affirmed Valdez's sentence because the record contained information showing the CI's account was sufficiently reliable: Valdez himself made statements to law enforcement aligning with the information in CI's reports, even on small details like drug code words. See *id.* at 1054–55.

This case is unlike *Smith* and *Valdez*. Helding made no statements about selling methamphetamine. The district court saw no affidavits, reviewed no reports from the case agent, and heard no testimony from law enforcement handlers or other witnesses corroborating the drug quantity information. The court relied solely on CI-1 and CI-2's statements as they were recounted in the PSR, which accounted for over 96% of Helding's drug quantity. And the probation office is undoubtedly right that it is not equipped to assess the reliability of information provided by law enforcement, at least without either the ability to talk to the CIs or further corroboration.

To be sure, our prior cases do contain some broad language describing the deference afforded the district court's credibility determinations—even where a witness has a history of criminal activity or drug use, as is often the case for informants in drug-related prosecutions. See, *e.g.*, *United States v. Galbraith*, 200 F.3d 1006, 1012 (7th Cir. 2000) ("[T]he

trial court is entitled to credit testimony that is totally uncorroborated and comes from an admitted liar, convicted felon, large scale drug-dealing, paid government informant.") (internal quotations omitted); see also *United States v. Harmon*, 721 F.3d 877, 888–89 (7th Cir. 2013). Though the threshold for a sufficient reliability finding may be low, it is not so low as to be met in the face of a defendant's objection by a confidential informant's out-of-court statement unaccompanied by *any* additional support.

Facing an objection like Helding's, the district court must take some step to ensure that the CI-provided information has a modicum of reliability. *Cf. United States v. Robinson*, 164 F.3d 1068, 1070 (7th Cir. 1999) ("While it's not required that a judge hear personally from witnesses under oath at a sentencing hearing about drug quantities, we think it's not a terribly bad idea to do so when the witness is going to provide the basis for, as here, 97 percent of a defendant's relevant conduct."). It remains within the district court's discretion to determine that step. It may be enough for the government to supply the probation office, and, in turn, for the PSR to include, some statement bearing on the reliability of information provided by a confidential source. In other instances, the district court may choose to request and review law enforcement reports containing the CI's reported information or information on the CI's reliability. In still others, the district court may find it appropriate to receive testimony from the handling case agent. Our observations in no way are intended to catalogue or prescribe the available pathways. How to proceed with the reliability inquiry and on what to base the reliability finding are committed to the district court's sound judgment.

But the sentencing record here did not contain enough to find the CI-provided information sufficiently reliable to influence Helding's guidelines determination and ultimate sentence. The district court exercised the discretion we recognized in *Corner* and deviated from the career-offender range, only then to find Helding responsible for over 32 times the amount of marijuana seized—a massive spike in drug quantity—based only on statements made by confidential informants to law enforcement and memorialized in the PSR. In these circumstances, that fell short of protecting a defendant's due process right to be sentenced on the basis of accurate information.

Accordingly, we REVERSE and REMAND for resentencing.