In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 23-2847

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JERRY PEOPLES,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-cr-00418-4 — **Robert W. Gettleman**, *Judge.*

_____

ARGUED SEPTEMBER 6, 2024 — DECIDED OCTOBER 24, 2024

_____

Before RIPPLE, SCUDDER, and ST. EVE, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Jerry Peoples and three friends
hatched a plan to rob a marijuana dealer. What they did not
know was that the police heard it all over a wiretap. As the
plot was playing out, the police stepped in and arrested Peoples and his confederates. Federal charges followed, and, for
his part, Peoples chose to go to trial. A jury found him guilty
of violating the Hobbs Act by conspiring and attempting to
rob a drug dealer. Peoples appeals, contending the district

court committed error in not granting his post-trial motions challenging the sufficiency of the government's evidence. We affirm, as the case against Peoples was overwhelming.

**I**

On June 13, 2017, Jerry Peoples met Ali Salem at a gas station in Bridgeview, Illinois to obtain a sample of marijuana. But Peoples intended more than trying Salem's marijuana. He used the meeting to set up a robbery of Salem's supplier—someone Peoples believed had a substantial stash of marijuana somewhere nearby. With three friends (Kelvin Everett, Quincy Wright, and Gregory Blackwell), Peoples devised a plan to learn the whereabouts of Salem's supplier. The idea was simple: Peoples would use the gas-station meeting to get the sample and then, with help from Everett, Wright, and Blackwell, the group would follow Salem back to his supplier. Once the whereabouts of the supplier became known, the crew would move in and steal the stash—or so they planned.

The police heard the entire plot over a wiretap of Everett's phone. Believing a violent crime was in the works, the officers got a step ahead and arrested Peoples and his crew as they sought to close in on Salem. A federal indictment followed, charging Peoples, as relevant here, with conspiring and attempting to interfere with commerce by robbing a drug dealer, in violation of 18 U.S.C. §§ 1951(a), 2.

The most damning evidence at trial came from the wiretaps the government played for the jury. In a conversation with Kelvin Everett, Peoples described the plan this way:

Peoples:     I promise that when I go meet him and
             then I know where he coming from so

next when I follow him, I know where he coming from with the shit.

…

Peoples:     We do our homework. We get in your car and boom and just go in. You know go up and down Harlem and Cicero. He gonna be meeting people and I know the car so bam … we on his ass dude.

…

Peoples:     That's what I'm saying. We grab him. We grab him I can guarantee you we grab him and we tell him look man, we need 500 of them thangs 200,000 fool. We can have that shit.

…

Peoples:     We ain't never gonna have to shit again fool. We buyin' buildings after buildings G, I swear to God. But see the only thing we need to do is move fast before somebody beat us to it.

Hearing this discussion left the police worried that Peoples was planning some sort of violent crime—perhaps a kidnapping or murder. So a group of officers hit the streets to conduct surveillance.

One officer told the jury that Peoples, Everett, and Wright entered Everett's home and, approximately 20 minutes later, left together in a car. Another officer explained that police then stopped the car, intending not to make arrests but instead to spook the crew from going forward with any planned crimes. The police's ploy did not work. After the stop the crew returned to Everett's house, where Peoples switched into a

different car and proceeded to meet with Salem at the designated gas station. Meanwhile, Everett and Wright drove to pick up Blackwell and along the way called Blackwell to ask whether he "got the poles"—street jargon for firearms.

The government's case also included testimony from Ali Salem. He explained to the jury that Peoples called him on June 13, 2017 to obtain a sample of marijuana. Salem agreed and supplied the sample after a brief meeting with Peoples at the gas station. The account the jury heard from Salem aligned with the gas station's video footage of the meeting. Salem further testified that he had given marijuana to Peoples twice before. On one prior occasion, Salem added, Peoples expressed interest in meeting his supplier.

After the meeting at the gas station, Peoples followed Salem and phoned Everett—relaying real-time updates of Salem's exact location. The government played this call for the jury:

Peoples:      Listen, listen listen he on Harlem, he um, well he goin up um 87th down Harlem, he goin south, he goin um East down Harlem. I'm followin.

                          …

Peoples:      [H]e scared man, and he got some more smoke, that's what he tryin to give me, he got some more shit G, he gave me a sample, that's what he was callin me, tryin to give me, and get some more smoke.

                          …

Peoples:      [L]isten, we on 87th and [] Oak Park Avenue bro, I'm following, I'mma follow

> him, listen listen, I'm going to follow him as far as I can, jus jus come, come 87th real quick bro.
>
> …
>
> Peoples:    I'm on his heels though, he can't leave me though cause I'm on his heels. He on 87th goin down uh comin back off Harlem foo, like we passed Oak Park, we comin' back to that area though.
>
> …
>
> Peoples:    Yeah, if he turns on um 87th and and and Ridgeland, stay on 95th, you gon see him, he's gonna come to 95th and Ridgeland bro.

This discussion prompted law enforcement to foil the plot before the situation got out of control. As Peoples was relaying Salem's whereabouts, Everett grew alarmed because the police had spotted and began trailing him. Peoples reacted with alarm of his own, telling Everett, "you know what to do, get off the phone and smoke their ass." Everett, Wright, and Blackwell proceeded to lead police on a chase—first by car and then on foot. Officers found two loaded guns in a bag that the trio tried to carry over a fence while running from law enforcement. The police later identified and arrested Peoples.

At the close of the government's case-in-chief, Peoples invoked Federal Rule of Criminal Procedure 29 and sought a judgment of acquittal. The district court reserved decision and sent the case to the jury.

After the jury returned guilty verdicts on both counts, Peoples renewed his Rule 29 motion while also moving for a new

trial pursuant to Rule 33. Both motions focused on the sufficiency of the government's evidence. The district court denied the motions, concluding that the evidence against Peoples was overwhelming. The district court later sentenced Peoples to concurrent terms of 110 months' imprisonment. This appeal followed.

## II

### A

The Hobbs Act makes it a crime for a person to "obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce, by robbery … or attempt[] or conspire[] so to do …." 18 U.S.C. § 1951(a). Adhering to our pattern instructions, the district court informed the jury that to sustain a conviction on the attempt count, the government had to prove beyond a reasonable doubt that (1) Peoples knowingly attempted to obtain money or property from the victim; (2) Peoples did so by means of attempted robbery; (3) Peoples believed that the victim would have parted with the money or property because of the robbery; and (4) Peoples's conduct would have affected or had the potential to affect interstate commerce. See *William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit*, at 784 (2023 ed.).

The district court added that an attempt also requires the intent to commit the full robbery and a substantial step taken toward that end. See *id.* at 77. A substantial step, the court explained, "must be an act that strongly corroborates that the defendant intended to carry out the robbery." *Id.* Putting the same point another way, we have conveyed that a substantial step is "something more than mere preparation, but less than the last act necessary before actual commission of the

substantive crime," *United States v. Muratovic*, 719 F.3d 809, 815 (7th Cir. 2013) (quoting *United States v. Barnes*, 230 F.3d 311, 315 (7th Cir. 2000)), or "something that makes it reasonably clear that had [the defendant] not been interrupted or made a mistake … [he] would have completed the crime," *United States v. Sanchez*, 615 F.3d 836, 844 (7th Cir. 2010) (alterations in original) (quoting *United States v. Gladish*, 536 F.3d 646, 648 (7th Cir. 2008)).

As for the conspiracy charge, the district court explained that the government had to prove not only that a conspiracy existed, but also that Peoples knowingly became a member of the conspiracy with an intent to advance its objective. See *William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit*, at 105; see also *United States v. Jett*, 908 F.3d 252, 273 (7th Cir. 2018).

In reviewing the denial of a Rule 29 motion for a judgment of acquittal, we apply the same standard as the district court. The overarching question is whether there was sufficient evidence to support the jury's verdict. See *United States v. Dewitt*, 943 F.3d 1092, 1096 (7th Cir. 2019). In undertaking this inquiry, we "consider the evidence in the light most favorable to the Government," and will reverse "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Blassingame*, 197 F.3d 271, 284 (7th Cir. 1999) (quoting *United States v. Moore*, 115 F.3d 1348, 1363 (7th Cir. 1997)). Reversal under this standard, we have emphasized, is a "nearly insurmountable hurdle." *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019) (citation omitted).

Peoples faces a similar uphill climb on his motion for a new trial. Rule 33 authorizes a district court to vacate a

judgment and grant a new trial "if the interest of justice so requires." Here, too, our review is limited and highly deferential, asking only "whether the district court's ruling reflected an abuse of discretion." *United States v. Jones*, 79 F.4th 844, 859 (7th Cir. 2023) (citing *United States v. Foy*, 50 F.4th 616, 622 (7th Cir. 2022)). Indeed, we have underscored that the "exercise of power conferred by Rule 33 is reserved for only the most 'extreme cases,'" *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (quoting *United States v. Morales*, 902 F.2d 604, 606 (7th Cir. 1990)), "those rare cases in which consideration of the evidence leaves a strong doubt as to the defendant's guilt of the charged offense," *United States v. Washington*, 184 F.3d 653, 658 (7th Cir. 1999).

B

The government urges us to forego review of the district court's denial of Peoples's request for a new trial, insisting that the motion was so underdeveloped in the district court (and again on appeal) as to preclude any meaningful judicial review. While a fair observation, the point need not detain us. Our review of the record shows that Peoples grounded his Rule 29 and 33 motions in the same core contention—that the government's evidence was insufficient to support the jury's verdict. In these circumstances, then, our review of the district court's denial of Peoples's Rule 29 motion is tantamount to reviewing the court's denial of the Rule 33 motion for a new trial.

On the merits, we agree with the district court's observations about the strength of the government's case against Peoples. The jury easily could have concluded from the wiretap alone that Peoples, Everett, Wright, and Blackwell agreed and planned to rob Ali Salem's marijuana supplier. In his own

words, Peoples described his plan to meet with Salem, track Salem back to the supplier, and make them "cough up" drug proceeds and marijuana. Law enforcement surveillance corroborated the plot. And Salem's testimony confirmed that he gave Peoples a sample of marijuana. The wiretap further established that Everett and Wright drove to pick up Blackwell, who brought two loaded firearms to carry out the robbery. The jury also heard how Everett, Wright, and Blackwell attempted to converge on Salem's location—using real-time directions that Peoples relayed via phone as he followed in pursuit.

The jury received ample evidence from which to conclude that Peoples and his crew would have completed the robbery had police not interfered. See, *e.g.*, *Muratovic*, 719 F.3d at 816 (finding the substantial step requirement satisfied where defendants assembled a team, finalized a robbery plan, and procured firearms). Indeed, even after police conducted a traffic stop, Peoples kept pressing forward with the robbery plan. Absent law enforcement intervention, then, "the ordinary and likely course of things" would have resulted in the commission of the robbery. *United States v. Villegas*, 655 F.3d 662, 669 (7th Cir. 2011) (quoting *Gladish*, 536 F.3d at 648). On this evidence, we have no difficulty concluding that the government proved that Peoples took a substantial step to rob Salem's supplier.

The evidence also sufficed to satisfy the Hobbs Act's interstate commerce element. In *Taylor v. United States*, the Supreme Court determined that "it is enough [under 18 U.S.C. § 1951] that a defendant knowingly stole or attempted to steal drugs or drug proceeds." 579 U.S. 301, 309 (2016). Where the "Government proves beyond a reasonable doubt that a robber

targeted a marijuana dealer's drugs or illegal proceeds, the Government has proved beyond a reasonable doubt that commerce over which the United States has jurisdiction was affected." *Id.* at 308.

This is not a close question here. Recall that Peoples devised his plan on the belief that following Salem would lead to his supplier—and by extension, a large stash of marijuana. Salem testified he gave Peoples marijuana on June 13, 2017 as he had a time or two before, with Peoples expressing interest in meeting Salem's supplier. What is more, Peoples's own words, recorded on the wiretap, revealed his intent to target a drug distributor for both drugs and drug proceeds. He referred, for example, to "get[ting] some more smoke" and demanding "500 of them thangs 200,000 fool." Peoples also told Everett, "we can have it all," "[a]ll the money and everything"—enough that they could "buy[] buildings after buildings." This evidence gave the jury plenty to find that he intended to "obtain illegal drugs and the proceeds from the sale of illegal drugs. Such proof is sufficient to meet the commerce element of the Hobbs Act." *Taylor*, 579 U.S. at 310.

Finally, rounding out the elements of the attempt charge, Peoples's statements also demonstrate his belief that Salem and the supplier would have parted with the money and drugs because of the robbery.

C

Peoples's only response is to urge us to see the evidence as showing nothing more than a plot to get a sample of marijuana. But that is an incomplete view of the record—one Peoples pressed at trial and the jury declined to accept. We need not accept it either. Peoples's arguments run headlong into

the highly deferential standard governing our review of a jury's verdict. The jury had a more than sufficient basis to conclude that Peoples conspired and attempted to interfere with commerce by robbing a drug dealer in violation of the Hobbs Act. We see no grounds to second guess their verdicts.

For these reasons, we AFFIRM.