In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 24-2725

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSE FARIAS,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17-cr-530 — **John Robert Blakey**, *Judge.*

———————————

ARGUED MAY 22, 2025 — DECIDED AUGUST 7, 2025

———————————

Before EASTERBROOK, ST. EVE, and KIRSCH, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Jose Farias was a high-volume drug trafficker. Together with a network of co-conspirators, he brought millions of doses of heroin and cocaine to the Chicagoland area in 2015 and 2016. Then, the Drug Enforcement Administration ("DEA") caught up to him.

A grand jury indicted Farias for conspiracy to distribute heroin and cocaine and possession of cocaine with the intent

to distribute. He went to trial on the charges and was con-
victed. At his sentencing, the district court attributed 130 kil-
ograms of heroin and 45 kilograms of cocaine to his trafficking
activities and imposed a 25-year term of imprisonment.

Farias appeals, asserting that trial testimony identifying
his voice on recorded calls violated his constitutional rights,
the district court erroneously instructed the jury that it could
give independent weight to translated transcripts of the calls,
there was insufficient evidence to support his conviction, and
the district court miscalculated his Guidelines range at sen-
tencing. We affirm.

## I. Background

In July of 2015, Jose Farias began trafficking large quanti-
ties of heroin and cocaine to the Chicagoland area. The plan
was simple. Farias would pay a Texas truck dispatcher cash
to send seemingly empty tractor-trailers to Chicago. In reality,
the drug conspiracy would load ten to twenty kilograms of
heroin or cocaine in hidden compartments ("traps") in the
trucks' axles. When the shipments arrived, co-conspirators re-
cruited and trained by Farias would disassemble the traps
and deliver the drugs to a customer Farias designated. They
then would reload the traps with cash proceeds and send the
trucks back to Texas.

There was just one catch. The Texas truck dispatcher
tipped off the FBI shortly after Farias contacted him. So fed-
eral agents were on to the conspiracy from its inception. In
early 2016, the DEA and local law enforcement set up remote
surveillance of a warehouse in Sugar Grove, Illinois. They ob-
served the conspiracy unloading drugs from a tractor-trailer,
intervened, and intercepted nearly 21 kilograms of heroin.

The drug conspiracy continued despite the seizure, and the government's investigation followed. After Farias moved the operation to a lot on Harrison Street in West Chicago, the DEA again set up surveillance. And in April of 2016, agents seized another 21 kilograms of heroin. During this seizure, law enforcement also arrested a key co-conspirator, Jesus Martinez-Reyes, who agreed to cooperate with the investigation. Then, in November of 2016, the DEA tracked the conspiracy to a final location, a mechanic shop in Channahon, Illinois. There, it intercepted nearly 17 kilograms of cocaine. It also arrested the owner of the shop, Raul Muñoz, and another co-conspirator, Eduardo Yanez-Barrera. Both agreed to cooperate and lead investigators to their off-site boss: Farias.

In the weeks that followed his arrest, Yanez-Barrera made recorded calls with Farias to discuss upcoming drug shipments and their prices. During one call, Farias admonished Yanez-Barrera in Spanish, warning him to be more careful:

> Mr. Farias: I need you to listen to me, dude, because if something happens, dude, and it's because of something dumb you did, there won't, there won't be any way to help you … Don't do things like that. Do things correctly because of the current problem.
>
> Mr. Yanez-Barrera: Okay.
>
> Mr. Farias: We're going to change everything. Everything is going to change [unintelligible] no longer going to work there with [unintelligible], but we need you guys to take the money out so it can be delivered.

In another call, Farias instructed Yanez-Barrera on how to divide proceeds between the conspirators.

A grand jury subsequently returned a two-count indict-ment charging Farias with conspiracy to distribute heroin and cocaine, and possession of cocaine with intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1), 846.

Farias pleaded not guilty and proceeded to trial on the charges. In the government's case in chief, four cooperating witnesses testified: Martinez-Reyes, Muñoz, and two Texas truck dispatchers. Their testimony revealed the far-reaching scope of the drug trafficking operation.

Martinez-Reyes related how Farias had taught him to dis-assemble tractor-trailers and access their traps at a warehouse in Naperville. He further testified that after this crash course in drug trafficking and truck mechanics, he unloaded four shipments from Farias at that same warehouse, each contain-ing between ten and twenty kilograms of heroin. Martinez-Reyes also told the jury that he unloaded an additional three or four unseized shipments of heroin from Farias at the Sugar Grove Warehouse and the Harrison Street Lot. Muñoz, for his part, testified to unloading two unseized shipments of be-tween 15 and 16 kilograms of cocaine at the Channahon me-chanic shop.

The Texas truck dispatchers corroborated Martinez-Reyes's and Muñoz's accounts. One dispatcher testified to co-ordinating approximately five or six deliveries to Chicago at Farias's behest. Another testified to dispatching between 15 and 20 trucks for Farias to destinations in Chicago, Northern Indiana, and Atlanta.

The jury also heard recordings of Yanez-Barrera's phone calls with Farias in Spanish and saw transcripts with English language translations of the calls.  To lay the foundation for

this evidence, DEA Agents Betancourth and Alarcon identified Farias's voice on the recordings. Agent Betancourth relied solely on a stipulated voice exemplar to identify Farias's voice, while Alarcon relied both on the exemplar and hearing Farias speak in the courtroom during trial.

The jury convicted Farias on both counts.

Farias moved for a judgment of acquittal, or, alternatively, a new trial. He contended that there was insufficient evidence to support his conviction, that Agent Alarcon's voice identification violated his constitutional rights, and that the court improperly instructed the jury on the evidentiary weight of the translated transcripts. The district court denied his motions.

At sentencing, the court found by a preponderance of the evidence that 130 kilograms of heroin and 45 kilograms of cocaine were attributable to Farias's trafficking activities. It also concluded that Farias was a "leader" or "organizer" of the conspiracy and applied an aggravating role sentencing enhancement. The court then calculated Farias's Guidelines range to be 360 months to life and ultimately sentenced him to a below Guidelines sentence of 300 months in prison.

Farias appeals both his conviction and his sentence.

## II. Discussion

Our decision proceeds in four parts. We first consider Farias's challenges to the admission of Agent Alarcon's voice identification and to the court's jury instructions. After assuring ourselves of the fairness of Farias's trial, we then review the sufficiency of the evidence supporting his conviction and the district court's calculation of his Guidelines range.

### A. Voice Identification

We begin with Farias's assertion that admission of Agent Alarcon's voice identification violated his constitutional rights. We review the district court's legal conclusions de novo and its underlying factual findings for clear error. *See United States v. Haldorson*, 941 F.3d 284, 290 (7th Cir. 2019); *United States v. Bonin*, 932 F.3d 523, 543 (7th Cir. 2019).

When laying the foundation for his identification of Farias, Alarcon testified that he compared the voice on the recorded calls to a stipulated exemplar of Farias's voice. Then, the government asked Alarcon:

Q. During the course of this trial, did you ever have occasion to overhear the defendant speaking?

A. Yes.

Q. When?

A. I believe it was on Thursday of last week.

Q. And what language was he speaking?

DEFENSE COUNSEL: Objection.

THE COURT: Sustained.

The court held a sidebar where the defense argued that reliance on in-court proceedings to identify Farias's voice was "prejudicial" and "interfere[d] with his right to be able to defend himself." The court overruled the objection, explaining that it had initially sustained the objection only out of concern that the questioning would go "into the content of some conversation he had in court, which would obviously be between himself and an attorney."

With the government warned not to inquire into the contents of attorney-client privileged conversations, the voice identification proceeded:

Q. Agent Alarcon, you were just testifying about overhearing certain conversations involving defendant. What was the volume of his voice?

A. Very loud.

Q. Okay. And did it sound like the same person from the voice exemplar that you reviewed?

DEFENSE COUNSEL: Objection.

ALARCON: Yes.

THE COURT: Overruled.

The defense did not ask Alarcon about the nature of the overheard conversation on cross-examination, nor did he seek leave to examine Alarcon outside of the presence of the jury.

After the jury returned a guilty verdict, Farias moved for a new trial, citing, in part, Alarcon's reliance on hearing him speak at trial to identify his voice. The district court heard argument on the question twice before finding that the statements Alarcon overheard were not private communications between Farias and his attorney, so admitting Alarcon's testimony was not error.

On appeal, Farias renews his contention that admission of Alarcon's voice identification testimony violated his rights—specifically his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel. We see no merit in either theory.

The Fifth Amendment provides that "no person … shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Amendment thus protects defendants against only a narrow class of self-incriminating conduct: compelled testimony. *See United States v. Hubbell*, 530 U.S. 27, 34 (2000) ("The word 'witness' in the constitutional text limits the relevant category of compelled incriminating communications to those that are 'testimonial' in character.").

"[I]dentifiable physical characteristics" are nontestimonial evidence that falls outside the privilege against self-incrimination. *United States v. Dionisio*, 410 U.S. 1, 5–6 (1973). So as Farias conceded at oral argument, he does not have a Fifth Amendment privacy interest in the sound of his voice, *see United States v. Neighbors*, 590 F.3d 485, 493 (7th Cir. 2009), and Alarcon's reliance on hearing the characteristics of his voice at trial did not violate his Fifth Amendment rights.

In the alternative, Farias asserts that admission of Alarcon's testimony interfered with his right to counsel and transgressed our precedent in *United States v. Jones*, 600 F.3d 847, 859–60 (7th Cir. 2010).

In *Jones*, we held that a trial court erred when it admitted voice identification testimony based on overhearing the defendant speak privately with his attorney in a "normal tone of voice." *Id.* at 859–60. Our reasoning sounded in the Sixth Amendment. We observed that the voice identification testimony had transformed defense counsel into the sole witness to a disputed fact—whether the conversation occurred—creating a conflict of interest. And because the advocate-witness rule generally bars counsel from testifying in a particular case without withdrawing, this conflict had the potential to deprive the accused of the "opportunity to challenge the

testimony by presenting his own version of events." *Id.* at 860. In other words, the voice identification testimony could force the defendant to choose between retaining his counsel and confronting a witness against him. We found such a Hobson's choice intolerable.

Farias asserts that the district court committed the same error in his trial as in *Jones*. We see a crucial difference: the record is devoid of any evidence that the conversation Alarcon overheard was either between Farias and his attorney or private. Unlike the witness in *Jones*, Alarcon did not specify whom Farias was talking to when he heard Farias's voice. Farias's counsel could have elicited testimony on this point by examining Alarcon outside of the jury's presence, but he did not do so. To support his claim, Farias instead points to the court's initial assumption that Alarcon overheard a conversation between Farias and his counsel. Yet the court subsequently disavowed that assumption, reasoning that there was no evidence to support it.

The record available corroborates the court's subsequent finding. While Alarcon did not say whom he heard Farias speaking to, he testified that Farias was speaking in a "very loud" voice, a mode of communication incompatible with a private conversation to which Farias's attorney would be the only other witness. We thus hold that the district court did not err when it admitted Alarcon's voice identification testimony.

## B. Translated-Transcript Jury Instructions

At Farias's trial, the district court instructed the jury from the Seventh Circuit's pattern instruction addressing English transcripts of foreign language recordings. It did so without objection from Farias and after holding several conferences to

review proposed jury instructions with the government and the defense.

The instruction apprised jurors that they could rely on translated transcripts of the Yanez-Barrera calls as substantive evidence. It read:

> During the trial, Spanish language recordings were admitted in evidence. You were also given English transcripts of those recordings so you could consider the contents of the recordings.

> [¶] It is up to you to decide whether a transcript is accurate, in whole or in part. You may consider the translator's knowledge, training, and experience, the nature of the conversation, and the reasonableness of the translation in light of all the evidence in the case. You may not rely on any knowledge you may have of the Spanish language. Rather, your consideration of the transcripts should be based on the evidence introduced in the trial.

The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit § 3.15 (2023 ed.).

Farias now asserts that this instruction misstates the law because it does not inform the jury that translated transcripts should not receive independent evidentiary weight and that the underlying Spanish language audio recordings are the "primary" evidence. *See United States v. Cruz-Rea*, 626 F.3d 929, 936 (7th Cir. 2010); *United States v. Nunez*, 532 F.3d 645, 651 (7th Cir. 2008).

By way of contrast, Farias points to our pattern jury instruction addressing transcripts of English language recordings, which states: "[t]he recording[s] are the evidence of

what was said and who said it. The transcripts are not evidence. … In other words, you must rely on what you heard, not what you read." The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit § 3.14 (2023 ed.).

Farias's challenge faces an initial hurdle—our presumption that the pattern jury instructions accurately state the law. *See, e.g.*, *United States v. Foy*, 50 F.4th 616, 623 (7th Cir. 2022); *United States v. Marr*, 760 F.3d 733, 744 (7th Cir. 2014). Here, we are doubtful that he could rebut the presumption because the distinction the pattern instructions draw between English and foreign language recordings is grounded in both foundational principles of evidence and practical reality.

Begin with the law. Relevant evidence is evidence which has any tendency to make a fact of consequence more or less probable than it would be without the evidence. Fed. R. Evid. 401. And unless barred by federal law, the federal rules of evidence, or other rules prescribed by the Supreme Court, relevant evidence is admissible, Fed. R. Evid. 402, meaning the jury may give it substantive weight.

Practically speaking, jurors can generally discern the contents of English language recordings themselves. *Cf.* 28 U.S.C. § 1865 (requiring jurors read, write, speak, and understand English). And while witness testimony may assist jurors in understanding English conversations in certain circumstances, any inferences about guilt or innocence come from considering this testimony in light of the juror's own understanding of the recorded conversation. In this context, transcripts of English language recordings impart no independent evidentiary content and cannot make facts of consequence more or less likely. So they may serve as illustrative aids, *see* Fed. R. Evid. 107, but not evidence. *See Neighbors*, 590 F.3d at

495; *United States v. Holton*, 116 F.3d 1536, 1542 (D.C. Cir. 1997) ("Every circuit agrees … that, while a jury may draw inferences of guilt from testimony or from a tape recording, it should not draw such inferences from a transcript.").

For translated transcripts of foreign language recordings, however, this is not the case. Our law prohibits jurors from relying on their own knowledge of foreign languages to interpret foreign language recordings. *See United States v. Marchan*, 935 F.3d 540, 548 (7th Cir. 2019). So translated transcripts can make facts of consequence more or less likely by imparting information the jury may not garner from any other source—namely, the content of the conversation. *Cf. Nunez*, 532 F.3d at 651 ("Transcripts of recorded conversations are a virtual necessity when the conversations take place in Spanish.").

This is not to say that translated transcripts of foreign language conversations are the *only* relevant evidence of the conversations. The underlying foreign language recordings are often crucial to the jury's assessment of the translation and the tenor of the conversation. Even as the jury may not rely on its foreign language skills to discern the words spoken, it may consider the recordings' audibility and the tone of the speakers' voices; it may also judge the identity of the speakers for itself. Video recordings may provide yet more evidence, such as participants' actions, facial expressions, and lip movements indicating who is speaking.

Indeed, the Best Evidence Rule demands that underlying recordings be admitted into evidence before translated transcripts are also offered. *See* Fed. R. Evid. 1002; *United States v. Chavez*, 976 F.3d 1178, 1196 (10th Cir. 2020) (finding that federal courts of appeals have "established that English-

translation transcripts may be admitted only where the underlying foreign-language recordings are themselves in evidence").

Our observation here is limited, then: translated transcripts—for which the offering party has laid a proper foundation and the underlying recordings were admitted—are substantive evidence, not simply illustrative aids.

We acknowledge that there is some tension between our commonsense conclusion and language in some of our prior opinions. *See, e.g.*, *Nunez*, 532 F.3d at 651 (holding that translated transcripts "should not ordinarily be given independent weight"); *Cruz-Rea*, 626 F.3d 929, 936 (7th Cir. 2010) (same). We do not fully resolve the tension today, though, because Farias waived his contention in the district court.

To preserve an objection to a jury instruction, a defendant must state the "specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30(d); *see also United States v. Gan*, 54 F.4th 467, 478 (7th Cir. 2022). If the defendant does so, we review his claim de novo. *United States v. Christophel*, 92 F.4th 723, 726 (7th Cir. 2024).

Conversely, where a defendant neither objects nor affirmatively assents to an instruction, we review the claim for plain error. *United States v. Leal*, 72 F.4th 262, 265 (7th Cir. 2023); *see* Fed. R. Crim. P. 52(b). And where a defendant expressly approves an instruction—evincing more than "a simple 'no objection'"—he waives any objection to it, precluding appellate review entirely. *Leal*, 72 F.4th at 265.

The question of the transcripts' evidentiary status first arose in response to Farias's objection at trial to the introduction of translated transcripts bearing alleged speaker names.

Farias requested that the government "actually play the re-
cordings and let the jurors follow along on the transcript and
read it," because "that is the evidence that we're relying on.
Not the transcript; it's the recordings." The court rejected the
request, remarking, "the audio recordings themselves are ev-
idence, as are the transcripts …. So both aspects are evidence."

But this was not the court's last word on the subject. Per-
haps recognizing the complexity of the issue, the court char-
acterized its ruling as "advisory" and invited the parties to
"think about the issue … and/or present any additional case
law" when it reconvened the following week. Farias did not
take the court up on its offer. Still, the court advised him that
there would be additional opportunities to submit proposed
jury instructions.

One of those opportunities arrived on the third day of
trial. At a conference with Farias and the government, the
court reviewed each proposed jury instruction and gave the
parties the opportunity to object. Neither the government nor
Farias objected to pattern instruction § 3.15 (Foreign Lan-
guage Recordings/English Transcripts). The government did,
however, object to pattern instruction § 3.14 (Recorded Con-
versations/Transcripts). Specifically, it contended that § 3.14's
statement that "[t]he transcripts are not evidence" would con-
fuse the jury, because the jury was only receiving transcripts
of Spanish-language conversations, which operate differ-
ently. Farias did not oppose the government's objection. So
with the agreement of the parties, the court struck the lan-
guage from pattern instruction § 3.14 that Farias now con-
tends was error to omit from § 3.15.

Yet even this conference did not conclude the matter. The
next morning the court asked defense counsel whether he had

"[a]nything—any issue, objection, or revision on behalf of the defense to adding the instructions or the verdict form?" Counsel responded in the negative. And once the government rested, the parties conferenced for a final review of the jury instructions. The court again confirmed that Farias had no objections. Defense counsel responded for a final time: "I do not have any objection."

We see more than rote agreement in this record. The precise legal question Farias contests on appeal arose before the district court: the evidentiary status of the translated transcripts. With due regard to its complexity, the court repeatedly invited Farias to propose alternative jury instructions addressing the transcripts. He did not. And that is not all. Farias agreed to remove from another pattern instruction the language he now argues was essential, tacitly conceding that the statement "the transcripts are not evidence" did not apply to translated transcripts of Spanish language conversations. Together, these actions demonstrate affirmative approval of the court's instruction and preclude further review of his claim.

### C. Sufficiency of the Evidence

We next consider Farias's contention that there is insufficient evidence to support his convictions. "In a sufficiency-of-the-evidence challenge after a jury verdict, we review the evidence presented at trial in the light most favorable to the government and draw all reasonable inferences in its favor." *United States v. Anderson*, 988 F.3d 420, 424 (7th Cir. 2021). We will disturb the jury's verdict only where "the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.'" *United States v. Peoples*, 119 F.4th 1097, 1101 (7th Cir. 2024) (quoting *United States v. Blassingame*, 197 F.3d 271, 284 (7th Cir. 1999)).

The government presented a robust case against Farias. It called several cooperating witnesses with firsthand knowledge of his actions, and it offered ample evidence corroborating those witness's accounts: tapes of Farias's calls with Yanez-Barrera, voice identification testimony from Agents Alarcon and Betancourth, phone records showing communications between Farias and the Texas truck dispatchers, and records of Farias and Martinez-Reyes's border crossings. Farias attempts to undermine the government's case by critiquing the credibility of the cooperating witnesses. But his arguments misapprehend our role. We may not second-guess the jury's credibility determinations or reweigh the evidence. *United States v. Foy*, 50 F.4th 616, 624 (7th Cir. 2022).

We hold that a rational jury could find Farias guilty beyond a reasonable doubt.

**D. Sentencing**

Satisfied that Farias's conviction is sound, we turn to his sentence. Farias alleges that the district court overestimated the quantity of drugs he trafficked and improperly applied a leader/organizer enhancement, resulting in an erroneous Guidelines range.

We review a sentencing court's factual findings—including its drug quantity calculations—for clear error. *United States v. Mireles*, 116 F.4th 713, 728–29 (7th Cir. 2024). Our review of whether the facts adequately support the application of a sentencing enhancement is plenary. *United States v. Craft*, 99 F.4th 407, 414 (7th Cir. 2024).

**1. Drug Quantity Calculations**

In service of proportional sentencing of drug offenses, the United States Sentencing Guidelines tie the severity of a

defendant's punishment to the quantity of drugs he trafficked, among other factors. *See* U.S.S.G § 2D1.1, cmt. backg'd (stating that § 2D1.1 provides for "a logical sentencing structure for drug offenses"); *see also United States v. Saunders*, 826 F.3d 363, 374 (7th Cir. 2016) (explaining how for "drug-related offenses, … the quantity of narcotics involved is an essential part of the sentencing analysis, as it is often a large determinant of the base offense level").

Under the Guidelines, drug conspiracy defendants are held responsible for the quantity of drugs directly attributable to them, as well as amounts reasonably foreseeable from the dealings of their co-conspirators. *United States v. Jones*, 56 F.4th 455, 506 (7th Cir. 2022); *see also* U.S.S.G § 1B1.3(a)(1)(B). Determining this value often requires some reasoned approximation. *See United States v. Sewell*, 780 F.3d 839, 849 (7th Cir. 2015) (explaining that drug quantity calculations need not be "an exact science").

When calculating drug quantities, a sentencing court may consider a broad range of evidence—so long as the information it relies upon possesses "indicia of reliability" and produces a reasonable estimate. *United States v. Gibson*, 996 F.3d 451, 464 (7th Cir. 2021) (quoting *United States v. Bozovich*, 782 F.3d 814, 818 (7th Cir. 2015)). Relevant inputs can include (but are not limited to): the quantity of drugs or proceeds seized by law enforcement, financial or other records of the conspiracy, co-conspirator testimony, similar transactions orchestrated by the defendant, and the physical capabilities of trafficking instrumentalities, such as labs and bottles. *See, e.g.*, *Gibson*, 996 F.3d at 464; *Sewell*, 780 F.3d at 849; *Saunders*, 826 F.3d at 375.

The court found 130 kilograms of heroin and 45 kilograms of cocaine attributable to Farias's offense conduct. Of those totals, 41.9 kilograms of heroin and 16.96 kilograms of cocaine are not disputed, as the government seized those amounts from the conspiracy. But Farias denies responsibility for any drugs not seized, protesting that the court grounded its estimation in unreliable evidence. We are not persuaded.

Martinez-Reyes testified that Farias directed the transport of four unseized drug shipments to the Naperville Warehouse, each containing between 10 and 20 kilograms of heroin, and three to four additional unseized shipments to the Sugar Grove Warehouse and Harrison Street Lot. As for the cocaine, Muñoz testified that he received three shipments from Farias at his shop and that each shipment contained approximately 15-16 bricks. Crediting this testimony, the district court conservatively estimated that 88.1 kilograms of unseized heroin and 28.04 kilograms of unseized cocaine were attributable to Farias.

Farias faces an uphill climb in his attempt to unsettle the district court's calculations because a court's credibility finding "can virtually never be clear error.'" *United States v. Turner*, 604 F.3d 381, 385 (7th Cir. 2010) (quoting *United States v. Pulley*, 601 F.3d 660, 661–62 (7th Cir. 2010)). This is not one of the rare cases where it is.

Martinez-Reyes's and Muñoz's testimony was consistent with the drug quantities and cash proceeds seized by law enforcement. It was also consistent with video evidence of Martinez-Reyes unloading tractors at Sugar Grove and Harrison Street and the size of the traps in the tractor-trailers Farias employed. These corroborating facts, together with the district court's express credibility determinations, assure us that the

court grounded its drug calculations in evidence with "indicia of reliability" and reached a reasonable estimate. *See Gibson*, 996 F.3d at 464; *cf. United States v. Helding*, 948 F.3d 864 (7th Cir. 2020) (reversing where a sentencing court relied on uncorroborated testimony from confidential informants without assessing their statements for reliability).

None of Farias's arguments to the contrary succeed. That Martinez-Reyes knew how many drugs had been seized from the Sugar Grove Warehouse and Harrison Street Lot does not render his testimony suspect. If anything, his deep knowledge of the trafficking scheme adds to his credibility. Martinez-Reyes's questionable testimony on other subjects also does not bar the district court from crediting his drug quantity testimony. *See United States v. Austin*, 806 F.3d 425, 432–33 (7th Cir. 2015) (explaining that a sentencing judge may find a witness's drug quantity testimony credible, even where the witness "outright lied" about other matters). Finally, while it is true that Martinez-Reyes and Muñoz testified to ranges of trafficked drugs, not exact quantities, our law is clear that courts "may rely upon ambiguous testimony to estimate drug quantity." *Id.* at 431.

In short, we find no clear error in the district court's drug quantity calculations.

### 2. Aggravating Role Enhancement

The United States Sentencing Guidelines provide for enhanced penalties for defendants who played an aggravating role in a criminal enterprise. *See* U.S.S.G. § 3B1.1. The Guidelines instruct that an "organizer" or "leader" of criminal activity involving five or more participants receives a four-level enhancement. § 3B1.1(a); *United States v. Weaver*, 716 F.3d 439,

442 (7th Cir. 2013). In comparison, a "manager" or "supervi-sor" of such a scheme receives a three-level enhancement. § 3B1.1(b).

While the Guidelines do not expressly define "leader," "organizer," "manager," or "supervisor," we have explained that commonsense judgments about a defendant's relative culpability within a conspiracy ought to drive the application of an aggravating role enhancement. *United States v. Barnes*, 141 F.4th 882, 888 (7th Cir. 2025). "[A] manager or supervisor should be straightforwardly understood as simply someone who helps manage or supervise a criminal scheme." *United States v. Grigsby*, 692 F.3d 778, 790 (7th Cir. 2012). And a leader or organizer exercises "a greater extent of authority than a su-pervisor or manager." *United States v. McGee*, 985 F.3d 559, 562 (7th Cir. 2021); *see also United States v. Colon*, 919 F.3d 510, 518 (7th Cir. 2019).

Indications of authority may include the defendant's abil-ity to make decisions for the conspiracy, his extensive partic-ipation in the scheme, his efforts to recruit accomplices, his exercise of control over others, and his claim to a larger share of the conspiracy's proceeds. No one factor is determinative. *See* U.S.S.G. § 3B1.1, cmt. n.4; *see also Anderson*, 988 F.3d at 428.

The record below clearly supports the district court's de-termination that Farias was a leader of the Chicagoland drug trafficking scheme. He exercised substantial authority over the direction of the scheme and his co-conspirators, facilitat-ing Martinez-Reyes's travel to Illinois on several occasions, personally teaching co-conspirators how to disassemble trac-tor trailers, arranging trucking contracts and warehouse loca-tions, overseeing day-to-day unloading and distribution of millions of doses of narcotics, and directing how much of the

drug proceeds should remain with the Illinois co-conspirators. In other words, the government offered abundant evidence that Farias was leader of the trafficking organization's Chicago operation, with his hands in all aspects of delivery and distribution.

Farias's attempt to evade this conclusion by casting himself as a mere "logistics manager" is unavailing. Drug trafficking is a logistics business—so if Farias was the logistics manager for a large region, like Northern Illinois, he was a leader.

*          *          *

The judgment of the district court is

AFFIRMED.